Leonard SCHULTZ, Plaintiff,

v.

READER'S DIGEST ASSOCIATION, Defendant.

Civ. No. 7–70310.

United States District Court, E. D. Michigan, S. D.

March 6, 1979.

gest Association alleging that he was defamed in an article published in Reader's Digest Magazine in December, 1976. The article, entitled *Why Jimmy Hoffa Had to Die,* was written by Lester Velie. It details the connections between Hoffa and the underworld and concludes that Hoffa was murdered because he posed a threat to the sweetheart contracts then being negotiated between the Teamster's Union and businesses controlled by the underworld. The only mention of the plaintiff in the article is as follows:

> On his way to the restaurant, Hoffa stopped off at the offices of an airport-limousine business in which he had a hidden interest. He asked for his partner, Louis Linteau. Apparently, Hoffa wanted others to know of his meeting. Finding that Linteau was out, Hoffa told several employees whom he was going to meet: Anthony "Tony Jack" Giacalone (T.J.), Tony Provenzano and a man named Lenny.

> Giacalone, according to Senate testimony, was the Mafia's enforcer in Detroit. Provenzano, a convicted extortionist, allegedly with mob connections, is now a Teamster boss in northern New Jersey. And Lenny was probably Lenny Schultz, an ex-convict associated with Giacalone. Two of the men had been close to Hoffa for years. But in Hoffa's struggle to return to power, which would have replaced Teamster president Frank E. Fitzsimmons, Giacalone and Provenzano had turned away from Hoffa and had decided to court Fitzsimmons. Hoffa perhaps sensed that his meeting could be a trap.

. . . . .

(The three men Hoffa had planned to meet on his last day denied meeting him and provided alibies.)

The defendant has moved for a summary judgment on three alternative grounds. First, the defendant claims that the references to the plaintiff contained in the article are not defamatory as a matter of law. Next, the defendant maintains that the plaintiff is a public figure for purposes of a

Neal Bush and Kenneth M. Mogill, Detroit, Mich., for plaintiff.

Curtis W. Poole, Jr., Kathleen McCree Lewis and Mark H. Sutton, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This is a libel case where the plaintiff, Leonard Schultz, has sued the Reader's Di-

libel action and cannot recover because the article was not published maliciously. Finally, the defendant argues that the article in question is subject to a state law privilege of fair comment requiring the plaintiff to show malice.

## A. Defamatory Nature of the Article

The defendant maintains that the above quoted references to the plaintiff are non-defamatory as a matter of law. It argues that although the article does refer to the plaintiff as one of the men that Hoffa planned to meet on the day he disappeared, there is nothing defamatory in this statement.

The plaintiff has also moved for a summary judgment that the article is libel *per se* because it imputes the commission of a crime to the plaintiff; that being the abduction and murder of Jimmy Hoffa. See *Sias v. General Motors Corp.,* 372 Mich. 542, 127 N.W.2d 357 (1964). The plaintiff alleges that not only does the article accuse him of setting up Jimmy Hoffa for abduction, it improperly characterizes him as an associate of an alleged underworld figure, Anthony Giacalone. This characterization the plaintiff claims lends credence to his theory that the article can only be read as imputing to him a role in the disappearance of Hoffa.[1]

The article here is susceptible of two interpretations, one of which is arguably non-defamatory, the other arguably defamatory. If one reads the article as merely stating a fact, i. e., that Jimmy Hoffa thought he was going to meet Leonard Schultz on the day he disappeared, it appears that the article does not fall within the definition of defamation set forth below.[2]

The article is, however, susceptible of another interpretation. The author clearly takes the position that Jimmy Hoffa was murdered. In addition, the article at the very least suggests that the meeting at the restaurant was "set up" with the intention that Hoffa would be abducted there. Viewing the article in this light, one gets the impression that Mr. Schultz may have been involved in "setting up" Jimmy Hoffa to be murdered. This interpretation is clearly defamatory.

Where words are susceptible of a possibly defamatory interpretation:

It is for the Court in the first instance to determine whether the words are reasonably capable of a particular interpretation or whether they are necessarily so; it is then for the jury to say whether they were in fact so understood. Prosser, *supra*, pp. 743–44.

As noted above, it appears that the article is reasonably susceptible of a defamatory interpretation, therefore it is for the jury to determine whether this is the way the article is understood. As a result, both motions for summary judgment regarding the interpretation of the article are denied.

## B. Public Figure

The defendant maintains, in the alternative, that the plaintiff is either a public figure for all purposes or a limited public

---

1. The only defamatory statement alleged in the complaint deals with Hoffa's planned meeting with Schultz. Since that time, the plaintiff has argued that other parts of the article are also defamatory, including the statement that Schultz is an "associate" of Giacalone. In view of the plaintiff's failure to attempt to amend his complaint, the Court will not consider the references to Schultz's relationship with Giacalone as separate defamatory statements. The Court is of the opinion, however, that these statements may be used as an aid in interpreting the statement alleged in the complaint.

2. The general rule is that:
 "Defamation is . . . that which tends to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. It necessarily, however, involves the idea of disgrace." Prosser, *The Law of Torts,* § 111, p. 739. This general rule is followed in Michigan. In *Nuyen v. Slater,* 372 Mich. 654, 662, 127 N.W.2d 369, 374 fn. (1964), the Court stated:
 A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him (3 Restatement, Torts, § 559 (1938)).

figure with respect to the Hoffa disappearance. If this is the case, Mr. Schultz can recover for the alleged defamation only by showing that the article was published with actual malice.

The public figure doctrine as it relates to defamation actions had its origin in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There the Court held that the First Amendment requires that a public official must prove that he was libeled with *malicious intent* in order to recover. The Court went on to hold that a finding of malicious intent requires a showing that the defendant published the defamatory article with actual knowledge of its falsity or with reckless disregard for its truth.

The malice requirement for public officials was later extended to "public figures" in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the later case of *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality of the Court extended the malice requirement to the situation where a private individual is defamed in a story of general or public interest. This position was later rejected in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Court held that a private person defamed in a story of public importance was not constitutionally required to show malice in order to recover. The Court went on to hold that the malice requirement applied only in cases where the individual defamed could be classed as a public figure.

The term "public figure" as defined in *Gertz* encompasses two classes of persons. The first class consists of "[those who] occupy positions of such pervasive power that they are deemed public figures for all purposes." *Id.* at 345, 94 S.Ct. at 3009. In order for a person to be classed as a public figure for all purposes, there must be "clear evidence of general fame or notoriety in the community and pervasive involvement in the affairs of society." *Id.* at 352, 94 S.Ct. at 3013. The court in *Gertz* recognized a second class of public figures consisting of those persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009. Such persons are held to be limited public figures with respect to publications concerning the particular controversy.

The public figure doctrine is an attempt to strike a balance between the First Amendment interest in a press free from the self-censorship considerations arising from the existence of libel laws and the state interest in providing civil remedies for defamatory falsehood. The public figure doctrine recognizes that the state interest in protecting certain persons classed as public figures is less than in the case of purely private individuals. An initial reason for the public figure classification was a perception by the *Gertz* court that states have a lesser interest in protecting public figures because these persons have greater access to channels of communication and hence are better able to counteract false statements about themselves without resorting to litigation. *Gertz, supra,* at 344, 94 S.Ct. 2997. More importantly, as the Court pointed out in *Gertz,* these persons by becoming public figures, have voluntarily exposed themselves to increased risk of injury from defamatory falsehood. Thus, they are less deserving of recovery. *Id.* at 344-45, 94 S.Ct. 2997.

In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court placed particular emphasis on this requirement of voluntariness. The action was brought by Mary Alice Firestone against Time Magazine for erroneously reporting the grounds on which her divorce petition was granted. Although the Court held that a divorce proceeding was not the type of public controversy contemplated by *Gertz,* it also indicated that Mrs. Firestone's involvement in the controversy was not sufficiently voluntary for her to be classed as a limited public figure under *Gertz.* In so holding, the Court noted that Mrs. Firestone did not "freely choose to publicize issues as to the propriety of her married life." *Id.* at 454, 96 S.Ct. at 965. Even

though she had held a few press conferences, the Court found that this did not make her a public figure because these conferences were merely to satisfy inquiring reporters and were not calculated to influence the resolution of the issue.

\* \* \*

In attempting to satisfy the requirements of the cases cited above, the defendant points to several factors which it claims indicate that Mr. Schultz is either a public figure for all purposes or a limited public figure with respect to the Hoffa disappearance. First, Mr. Schultz has been mentioned in 95 newspaper articles between 1945 and the publication date of the article in question. He was the subject of a Michigan Supreme Court opinion in 1946 affirming his conviction for receiving stolen goods. He is a friend and possibly an associate of Anthony Giacalone, a reputed underworld figure. He has been called before two grand juries. He has appeared on a local radio talk show and has been interviewed by NBC,[3] CBC and a local television station.

As noted above, the Court in *Gertz* held that in order for a person to be classed as a public figure for all purposes there must be clear evidence of that person's general fame or notoriety and pervasive involvement in the affairs of society. An analysis of the evidence presented by the defendant shows that Mr. Schultz is not a person of general fame nor is his involvement in the affairs of society pervasive.

The notoriety accorded Mr. Schultz falls into several discrete categories. First, Mr. Schultz was the subject of several newspaper articles between 1945 and 1960 concerning his arrest, conviction and sentencing for various crimes. His name next appeared in the media in 1964 when several articles reported that he had organized picketing by nursing home employees of the Wayne County Welfare Department.

Schultz was the subject of brief media attention in 1969 when some newspaper articles reported that the Internal Revenue Service was renting part of a Detroit building in which Schultz had a financial interest. The articles reported that Schultz had purchased this interest from Peter Licavoli, a reputed underworld figure in Detroit.

Beginning in 1974 several articles appeared regarding Schultz's interest in the Southfield Athletic Club. These articles dealt with the inability of his sons, the alleged owners of the club, to obtain a liquor license. This inability was the result of suspicions that their father, who had given them $400,000 to start the business, was a silent owner of the club. Several of the articles report Mr. Schultz's opinion that his sons were merely being punished for his past wrongs.

Many of the articles relied on by the defendant relate to Schultz's involvement in the murder of Harvey Leach, a Detroit furniture executive. These articles typically report that Leach was on his way to a meeting at Schultz's home when he was abducted and killed. Most of the articles point out that Schultz was a labor consultant for Leach's firm and that he had loaned Leach money in the past. The articles also typically report that the murder of Leach was suspected to be a gangland killing.

Several other articles deal with issues peripherally related to the Leach murder. A few detail the bankruptcy suffered by Leach's firm after his death and the settlement Mr. Schultz received for the remainder of his labor consultation contract with the firm. Other articles deal with the purchase of the firm's assets by a lawyer connected with Anthony Giacalone, a reputed underworld figure. Still other articles deal with Schultz's claim that police investigating the murder were constantly harassing him.

Schultz also received considerable publicity following the February 1975 robbery of his home. Several articles report Schultz's dissatisfaction with the way the robbery was treated by the police and the Courts. There are also some articles detailing Schultz's contention that the robbery was instigated by the police and FBI in hopes of uncovering evidence of the Leach murder.

**3.** It does not appear from the record whether this interview was ever broadcast.

The last and by far the largest category of newspaper articles and television appearances relied on by the defendant deal with the disappearance of Jimmy Hoffa. Most of these articles mention that Hoffa was planning to meet with Schultz, Anthony Giacalone, and Tony Provanzano at the time he was abducted and that Schultz is an ex-convict and friend or associate of Giacalone.

The Court does not believe that the media coverage noted above is sufficient to place Mr. Schultz in the class of public figure for all purposes. First, the Court must discount all the indicia of Schultz's notoriety prior to 1974. The events occurring prior to 1974 which brought Schultz into the public eye were intermittent. Moreover, the public attention accorded these events as evidenced by newspaper articles was not great. As a result, these events cannot be used to support a finding that the plaintiff is a public figure for all purposes.

With respect to the events which occurred after 1974, the Court is of the opinion that these events and the public attention accorded Schultz because of them is insufficient to confer the status of public figure for all purposes on the plaintiff. First, the Court notes that the public attention accorded Schultz between 1974 and the publication date is related to four discrete events: his sons' failure to obtain a liquor license, the Leach murder, the robbery of his home, and the Hoffa disappearance. A review of the newspaper articles relied on by the defendant reveals that much of the publicity surrounding the liquor license controversy and the robbery was probably the result of Schultz's position in the Leach affair.

■ The Court does not believe that the publicity surrounding these four events sufficiently demonstrates either that Mr. Schultz was a person of general fame or a person pervasively involved in the affairs of society. Although the term "general fame" is nebulous, it certainly means more than having one's name connected with a few events of public interest. Any fame which Mr. Schultz achieved appears to be related to what the Court must assume was passive involvement in events of public interest, i. e., the Leach murder and the Hoffa disappearance. In addition, there is no evidence that the plaintiff enjoyed any pervasive notoriety apart from the attention he received in relation to these events.

Furthermore, even assuming that one can gain general fame by being connected with a few events of public interest, the Court has grave doubts whether the amount of public attention given Mr. Schultz between 1974 and the time of the publication is sufficient to confer upon him the general fame required for a person to be classed as a public figure for all purposes. Although many of the articles dealing with the Leach murder do make more than a passing reference to Schultz, there are only a few articles that deal solely or in large part with the plaintiff. The articles dealing with Hoffa's disappearance do not concentrate to a great extent on Schultz. In fact, most of them mention his name only once or twice and the attention given him is overshadowed by that given other targets of the Hoffa investigation. And while he is mentioned in articles dealing with the problems his sons were having procuring a liquor license and articles regarding the robbery of his home, these articles cannot be regarded as the type which lead to pervasive or general fame.

Thus, while Schultz is mentioned in a large number of articles and has given interviews to the media, it cannot be said that at the time of the article in question he had gained a general and pervasive fame in the community.[4] In addition, although the test

4. The defendant attempts to bolster its argument by citing a large number of cases which have held persons who have achieved less notoriety than the plaintiff to be public figures. *See*, e. g., *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2nd Cir., 1977); *Hotch-* *ner v. Castillo-Puche, et al.*, 551 F.2d 910 (2nd Cir., 1977); *Grzelak v. Calumet Publishing Company, Inc.*, 543 F.2d 579 (7th Cir., 1975); *Hoffman v. Washington Post Company*, 433 F.Supp. 600 (D.D.C.1977); *Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D. Wisconsin, 1977),

for determining whether a person is a public figure is not a numbers game, the evidence indicates that Mr. Schultz possessed no more general fame than the individuals found not to be public figures in *Gertz, supra,* and *Firestone, supra.* As Professor Robertson has stated with respect to the plaintiff in *Gertz:*

> Elmer Gertz was a "prominent" individual. He had authored four books and (according to his own affidavit) "thousands" of articles appearing in "historical, legal, literary . . . and other publications," he had been the subject of over forty articles in Chicago papers, he had made many television and radio appearances in Chicago and elsewhere; he had served as an officer of many civic and professional organizations. Under pre-*Gertz* decisions, this degree of notoriety would have qualified him as a public figure; nevertheless, the Supreme Court found him private. Robertson, *In Praise of Gertz v. Robert Welch, Inc.,* 54 Tex. L.R. 199, 22 (1976).

In *Firestone,* supra, Justice Marshall, in dissenting, argued that the plaintiff was a public figure. Among the factors cited by Justice Marshall were: (1) the plaintiff was a prominent member of Palm Beach society; (2) her activities attracted the attention of a sizable portion of the public; (3) she subscribed to a press clipping service; (4) her divorce trial attracted national coverage; (5) her divorce alone was the subject of 88 articles in local newspapers; and (6) she held news conferences during the divorce proceedings.

The indicia of general fame presented in this case are no more compelling than those listed above. Therefore, it is difficult for the Court to conclude that Leonard Schultz is a public figure for all purposes if the plaintiffs in *Gertz* and *Firestone* were not. Furthermore, in addition to the requirement of general fame, *Gertz* held that in order for a person to be classed as a public

figure for all purposes, there must be clear evidence of his pervasive involvement in the affairs of society. The evidence submitted by the defendant shows only that Schultz was connected with a few events of public interest. The Court does not believe that this is sufficient to establish his pervasive involvement in the affairs of society.

For the reasons stated above, the Court cannot hold that the plaintiff has gained such fame and notoriety that he can be deemed "a public personality for all aspects of his life." *Gertz, supra,* 418 U.S. at 352, 94 S.Ct. at 3013.

In the alternative, the defendant alleges that the plaintiff is a public figure with respect to the limited issue of Hoffa's disappearance. In *Gertz,* the Court recognized that the malice requirement is applicable to certain persons for a limited range of issues where those persons "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009.

In determining whether the plaintiff qualifies under this formulation, the Court must decide two issues: first, whether there is a public controversy; and second, whether the nature and extent of the plaintiff's participation in the controversy is sufficient to establish that he voluntarily injected himself into the controversy. *Tribe, American Constitutional Law,* at 644 (1977).

▪ It is clear that the disappearance of Jimmy Hoffa is a public controversy which meets the requirements of *Gertz.* It does not appear, however, that Mr. Schultz's participation in this controversy satisfies the voluntariness aspect of *Gertz.* The evidence establishes that plaintiff did not voluntarily enter or thrust himself into the Hoffa controversy. The newspaper and magazine articles presented by the defendant clearly show that the publicity accorded

aff'd 579 F.2d 1027 (7th Cir., 1978). *Wolston v. Reader's Digest Association, Inc.,* 429 F.Supp. 167·(D.D.C.1977). While these cases may involve persons of less general fame than Schultz, they all involve cases where the plain-

tiff was found to be a limited public figure or a public official. Thus, they are irrelevant to the issue of whether Schultz is a public figure for all purposes.

him in the Hoffa case was not sought. These articles make it clear that Schultz is mentioned in the Hoffa stories only because it was thought that Hoffa had told certain people he was on his way to meet Schultz. Thus, it cannot be said that Leonard Schultz voluntarily injected himself into the Hoffa controversy.

■ The defendant points to several facts that it maintains show that Schultz voluntarily injected himself into the Hoffa controversy. First, the defendant points out that Schultz contacted Anthony Giacalone at the request of Jimmy Hoffa, Jr. the day following the disappearance of Hoffa, Sr. Although this does indicate some voluntary involvement, it can hardly be termed an act which injected the plaintiff into "the forefront" of the Hoffa controversy. Similarly, the fact that Schultz talked to the FBI and testified before a grand jury investigating the Hoffa disappearance can hardly be used to support a finding that he voluntarily thrust himself into the Hoffa controversy.

■ Nor does the Court believe that Schultz's response to the alleged defamation shows that he voluntarily injected himself into the Hoffa controversy. If one through no purposeful action of his own becomes involved in a public controversy, his response to charges by way of denial or whatever should not, absent other factors, be taken as an indication of voluntary involvement. As much is clear from *Firestone*. Mrs. Firestone held press conferences which dealt with the subject matter of the alleged defamation. These conferences were clearly the result of attention which she had involuntarily attracted. Despite this, the Court failed to find the degree of voluntariness required for a person to become a public figure. Similarly, Schultz's response to reporters' inquiries, whether in the form of statements regarding his involvement or the supposed whereabouts of Mr. Giacalone [5] cannot seriously be taken as indications that the plaintiff

voluntarily thrust himself into the forefront of a public controversy.

As the Court stated in *Wolston v. Reader's Digest Association*, 429 F.Supp. 167, 176 (D.D.C.1977), aff'd 188 U.S.App.D.C. 185, 578 F.2d 427 (1978):

> The Constitution, according to the Supreme Court respects the state's interest in protecting the reputation of a person who has done nothing—or very little—to sacrifice it himself.

Here, the Court is of the opinion that Leonard Schultz has done very little to attract attention to himself regarding the Hoffa controversy. As a result, it is impossible for the Court to hold that he is one of those persons who "have voluntarily exposed themselves in a meaningful sense to an enhanced risk of defamation." *Robertson, In Praise of Gertz v. Robert Welch, Inc.*, 54 Tex.L.Rev. 199, 221 (1976).

Despite the inapplicability of the voluntary public figure standard to this case, the defendant at least hints that Schultz could be classified as an involuntary public figure for purposes of the Hoffa investigation. In *Gertz*, the Court recognized that it might be possible for one to become a public figure through no purposeful action of their own. However, the Court warned that such instances were exceedingly rare.

The continued vitality of this classification is called into serious question by the opinion in *Firestone*. As Justice Marshall recognized in his dissenting opinion, quite apart from the question of whether Mrs. Firestone voluntarily invited public attention, her actions were such that the press was entitled to assume such voluntariness. *Id.*, 424 U.S. at 486–87, 96 S.Ct. 958. Thus, Justice Marshall recognized that, irrespective of her voluntariness, Mrs. Firestone did fit within that class of persons which *Gertz* appeared to recognize as involuntary public figures. Thus, it appears to this Court that the *Firestone* opinion forecloses the possibility of one becoming an involuntary public figure.

---

5. Schultz was quoted as stating that he believed that Giacalone was in the Southfield Athletic Club at the time of Hoffa's disappear-

ance. He also defended Giacalone's reputation on a radio show which dealt mostly with the Leach affair.

Even if the category of involuntary public figure were not foreclosed, the Court is of the opinion that it would not apply to this case. In *Gertz*, the Court relied heavily on the fact that a public figure assumes an increased risk of defamation. At the very least, the emphasis given to assumption of the risk in *Gertz* indicates to the Court that a qualitative distinction must be made regarding types of involuntariness. On the one hand, a person who engages in conduct that unintentionally or unknowingly attracts public attention might be classed as an involuntary public figure because in some sense he can be said to have assumed the risk of his own conduct. On the other hand, a person who becomes the object of public attention through no action of his own cannot be said in any real sense to have assumed the increased risk of defamation and would not therefore become a public figure.

Placing the emphasis on the voluntariness of the action leading to publicity gives meaning to the following passage from *Gertz*:

> Even if the foregoing generalities [i. e., that a public figure has assumed an increased risk of defamation] do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. *Id.*, 418 U.S. at 345, 94 S.Ct. at 3010.

Thus, when a person voluntarily acts in a way which unwittingly attracts publicity, the press is free to assume that his voluntary action indicates a voluntary assumption of an increased risk of defamation, and the person could be classed as a public figure.[6] However, a person who does nothing, but nevertheless becomes the subject of attention, clearly has not assumed such a risk and there is no justification for the press assuming that he has.

As a result, the Court is of the opinion that in a case such as this where the plaintiff's only voluntary actions are more or less in response to publicity which he did nothing to create,[7] he cannot become a limited public figure.

### C. Fair Comment

Although the Court has held that the Constitutional defense raised by the defendant is without merit, the defendant's assertion that the common law privilege of fair comment applies in this case must be considered. In *Gertz, supra*, the Supreme Court left the states free to establish their own fault standards in libel cases not involving Constitutional questions. The defendant asserts that pre-*Gertz* and post-*Gertz* decisions by Michigan appellate courts establish a common law privilege regarding comment about events of legitimate public interest.

A recent decision by the Michigan Court of Appeals supports the proposition advanced by the defendant. In *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. 153, 266 N.W.2d 693 (1978), the plaintiff, an attorney, claimed that he was libeled in a newspaper article regarding his representation of an indigent criminal defendant. The article in question implied that he had been appointed to represent a criminal defendant on appeal because he was a friend of the trial judge. The article also alleged that the plaintiff had failed to raise an issue regarding the trial judge's misconduct during the course of the trial.

Although the Court rejected the defendant's public figure defense, it did find a qualified privilege of a newspaper to report on matters of public interest. Thus, the Court held that the plaintiff had the burden of establishing actual malice in order to recover.

---

**6.** Cf. *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859 (5th Cir. 1978) ("the status of public figure *vel non* does not depend on the desires of an individual").

**7.** There is no evidence that Schultz set up a meeting with Hoffa or planned to meet him. The only evidence presented by the defendant is that Hoffa thought he was going to meet Schultz.

The plaintiff contends that the decision in *Peisner* should not be applied to the instant case at bar because it is not a decision by the Michigan Supreme Court and because decisions by that court do not support a holding that a qualified privilege exists with respect to stories involving matters of legitimate public interest where the plaintiff is not a public figure or public official.

The Court is of the opinion that this argument is without merit. It is true that the decision in *Peisner* was not rendered by the Michigan Supreme Court and is, therefore, not binding on this Court. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). However, the decisions of intermediate appellate courts have great weight in the absence of adverse pronouncements from the state's highest court. *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

In view of the fact that the decision in *Peisner* is entirely consistent with and supported by decisions of the Michigan Supreme Court, the Court is of the opinion that it accurately states the law of Michigan and should be followed in this case.

While it is true that most cases decided by the Michigan Supreme Court in this context have dealt with persons who would be considered public figures or public officials, an examination of these opinions reveals that the privilege applied should not be limited to such cases.

The existence of a qualified privilege in Michigan has stemmed from the duty of the publisher of a statement to make the statement in question:

> Qualified privilege exists in a much larger number of cases. It extends to all communications made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. *Timmis v. Bennett*, 352

Mich. 355, 366, 89 N.W.2d 748, 753, quoting *Bacon v. Michigan Central Railroad*, 66 Mich. 166, 170, 33 N.W. 181.

Thus, it is clear that the doctrine of qualified privilege does not rest on a finding that the plaintiff is notorious, but rather it rests on the interest or duty of the person making the statement. Most Michigan Supreme Court cases discussing the privilege in the context of a newspaper article deal with situations where a public official has been accused of misfeasance or malfeasance. Despite this, the language of these decisions cannot reasonably be read as being limited to situations involving public officials. For example, in *Miner v. Detroit Post and Tribune Co.*, 49 Mich. 358, 13 N.W. 773 (1882), the Court held that a newspaper's report of alleged misfeasance by the police justice of the City of Detroit was subject to a qualified privilege requiring that the plaintiff show actual malice. Although it is clear that the plaintiff in *Miner* was a public official, the Court's language was not limited to public officials. The Court continually referred to the privilege as it related to matters which concern the public or the community. Since matters of public concern are not limited to those involving public officials, it is apparent that *Miner* must be taken as establishing the existence of a qualified privilege for stories involving matters of public concern.

Similarly, in *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719 (1959), the Court considered a situation where the plaintiff, the deputy superintendent of police in Detroit, was allegedly libeled by several newspaper articles that charged him with fraud and corruption. The Court held that these communications were subject to a qualified privilege. In doing so, the Court recognized that it was the occasion and not the language used that determined whether a privilege existed. Although the Court did note that the article published involved a public official, there are indications that it did not consider the privilege limited to such situations. The Court's opinion quoted at length from the trial court's charge to the jury, which stated in part:

'In determining whether or not a qualified privilege did exist in this case, you are charged that the publishers of newspapers owe a duty to publish matters of public interest and are not required to determine the exact truth or falsity of what they publish, provided they believed what they published to be the truth and published them in good faith.' *Id.* at 145, 97 N.W.2d at 724.

While the Court held that the charge was in error because the question of privilege is one for the Court and not for the jury, it did not state that the charge was insufficient from the standpoint of setting forth the legal principle to be applied in determining the existence of the privilege. This is a clear indication that the privilege extends to stories of public interest involving private persons who are not public officials or public figures.

Also of interest is the Supreme Court's decision in *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748 (1958), where an attorney allegedly libeled a public official in a letter sent to a number of persons. The Court held the publication to be privileged:

It may be assumed that citizens generally are concerned with matters of such character. Obviously, the public welfare is involved therein. We think the doctrine of qualified privilege may properly be regarded as including statements made in good faith by a citizen of a community having, or claiming to have, special knowledge or information bearing on such matter of public concern and communicated to others concerned or interested. *Id.* at 369, 89 N.W.2d at 755.

Thus, while *Timmis* did involve a public official, the language quoted above clearly demonstrates that a qualified privilege may exist where the plaintiff is a private person.

The Court's reading of Michigan cases is confirmed not only by *Peisner*, but also by decisions of other courts. In *Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D.Wis.1977), aff'd 579 F.2d 1027 (7th Cir. 1978), the Court held that a statement is entitled to a qualified privilege under Michigan law if it deals with a matter of public concern even though the statement concerns a purely private plaintiff.

Of even greater importance is the decision in *Orr v. Argus-Press*, 586 F.2d 1108 (6th Cir. 1978), where the defendant published an allegedly libelous article concerning the indictment and arrest of the plaintiff on charges of securities fraud. Despite the fact that the Court found the plaintiff to be a public figure, it also stated that the defendant was entitled to a qualified privilege irrespective of the notoriety accorded the plaintiff:

The newspaper's second, principal defense under Michigan law is that the plaintiff must prove that the newspaper published the article in "bad faith" or with "ill will." As a story about a matter of public concern, the article is protected under state law by the qualified privilege of "fair comment." *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719 (1959); *Miner v. Detroit Post and Tribune Co.*, 49 Mich. 358, 363–65, 13 N.W. 773 (1882) (Cooley, J.). *See Restatement of Torts*, §§ 606, 607 at 275–285 (1938). *Accord, Nuyen v. Slater*, 372 Mich. 654, 127 N.W.2d 369 (1964); *Bufalino v. Maxon Brothers, Inc.*, 368 Mich. 140, 153, 117 N.W.2d 150, 156 (1962). Everyone, citizen or reporter, has the right to comment on matters of public importance, and expressions of opinion and even misstatements of fact are not actionable in a libel suit unless made maliciously for the purpose of damaging another's reputation. *Id.* at 1113.

Based on the authorities cited above, the Court is of the opinion that an article involving a matter of public concern is subject to a qualified privilege under Michigan law. Although there can be no dispute that the article in question involved a matter of public concern, the plaintiff contends that the qualified privilege should not be applied to him because he was not a central figure in the Hoffa disappearance. Whatever role Schultz played in this matter, it is clear to the Court that the question of who Hoffa was to meet on the day he disappeared was and is an important matter of public concern.

■ As a result, the Court is of the opinion that the story in this case is subject to the qualified privilege rule of Michigan and the plaintiff must show actual malice in order to recover.

### D. Actual Malice

The standard to be used under Michigan law to determine the existence of actual malice is not entirely clear. In *Timmis v. Bennett*, 352 Mich. 355, 367, 89 N.W.2d 748, 754 (1958), the Court, quoting from *Bacon v. Michigan Central R. Co.*, 66 Mich. 166, 173, 33 N.W. 181 (1887), stated:

> The effect, therefore, of showing that the communication was made upon privileged occasion is prima facie to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice, in fact, resting, as it must, upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury.

In *Lawrence v. Fox, supra*, the Court enunciated a standard more similar to that set forth by the Supreme Court in *Sullivan v. N.Y. Times, supra*, stating that the privilege exempted from liability those statements honestly believed to be true and published in good faith.

More recent cases from the Michigan Court of Appeals have adopted the *New York Times* malice standard of knowledge of falsity or reckless disregard for the truth. See *Peisner, supra; Tumbarella v. Kroger Co.*, 85 Mich.App. 482, 271 N.W.2d 284 (1978). In commenting on the difference between the Michigan definition of malice and that employed in *New York Times v. Sullivan, supra*, the Court of Appeals for the Sixth Circuit recently stated:

> If the plaintiff is a "public figure," misstatements of fact are not defamatory unless made with knowledge of their falsity or with a reckless disregard for the truth of the statements. *Gertz, supra*,

418 U.S. at 334–36 n. 6 [, 94 S.Ct. 2997, at 3004–5 n. 6, 41 L.Ed.2d at 802–03 n. 6]; *Curtis Publishing Co. v. Butts*, 388 U.S. 130, [87 S.Ct. 1975, 18 L.Ed.2d 1094] (1967); *New York Times v. Sullivan, supra*. The standard is similar in practice to the Michigan "fair comment" privilege. While the state standard emphasizes the subjective good faith of the publisher, the constitutional definition of malice is more concerned with showing the publisher's subjective reckless disregard for accuracy. It is theoretically possible, in other words, that a newspaper might subjectively believe in good faith that a statement is true under state law and, at the same time, publish the statement without sufficient regard for its truth under the first amendment. We do not believe the evidence is sufficient to support a finding of malice under either of the subjective tests. If we convert these subjective "malice" standards into a more objective test, as suggested by Deans Prosser and Wade and Justice Harlan, we find no evidence that the defendant was guilty of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Curtis Publishing Co.*, 388 U.S. at 155, [87 S.Ct. 1975, at 1991] (Harlan, J.). *Orr v. Argus-Press Co., supra*, at 1115–16.

Thus, it is clear that while the federal standard may not be applicable to this case, it is similar enough to the Michigan standard to make federal decisions in the area relevant. The Court is of the opinion that, no matter which of these standards is applied, the defendant in this case is entitled to a summary judgment. The deposition and affidavit of author Lester Velie, along with the affidavits of Fulton Oursler, Jr., Issue Editor at the time the article was published; Nancy Clark, the Research Associate responsible for verifying the content of the article in question; and Jennifer Bolch, another Research Associate who worked on the article establish that there is no genuine issue of material fact and that the plaintiff will not be able to show the existence of malice.

The affidavits show that the author as well as his research associates relied on contemporaneous reports in local and national newspapers and magazines for the statements regarding Mr. Schultz. Clearly these reports supplied an adequate foundation for publishing the portions of the article dealing with Mr. Schultz. Furthermore, since these sources are well recognized publications in the field of journalism, they must be recognized as reliable.

 The inescapable conclusion that follows from this evidence is that the research performed by the author and others at Reader's Digest convinced them that statements regarding Mr. Schultz were true. Thus, the record clearly demonstrates that the article was honestly believed to be true and was not published with a reckless disregard for its truth.

Although the Court recognizes that Michigan courts have generally held that actual malice is a jury question, *Lawrence v. Fox, supra,* federal courts applying Rule 56 have granted summary judgment in cases involving subjective intent, including libel cases involving questions of malice. See generally, 6, Pt. 2 Moore's Federal Practice ¶ 56.-17[1]; *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), cert. denied 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). Thus, while the Court admits that the question of malice or mental state is generally a question to be resolved by the jury, the Court cannot ignore the clear facts regarding the research and preparation of the article in question.

The case for granting a summary judgment here is made even stronger by the plaintiff's failure to raise any inference whatsoever regarding malice. The plaintiff does not dispute that the research efforts described in the defendant's affidavits took place. Similarly the plaintiff has not produced one evidentiary fact which even remotely suggests that Mr. Velie or anyone at Reader's Digest possessed facts which would indicate that the story was false, with the exception of the plaintiff's denial that he was scheduled to meet Hoffa.[8]

In essence, the plaintiff attempts to raise a question of fact by engaging in conjecture and speculation. The plaintiff first contends that the defendant's failure to conduct an independent investigation raises an inference of malice. Legally, the failure of a reporter to adequately investigate has been held to be insufficient to constitute malice under the federal standard. *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967). However, where, as in this case, the publication involves a story that is not "hot news" malice may be inferred from a grossly inadequate investigation. *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024 (5th Cir. 1975). Similarly, some Michigan courts have indicated that the type of investigation conducted is relevant to a determination of malice. *Ball v. White,* 3 Mich.App. 579, 143 N.W.2d 188 (1966). Whether the defendant had a duty to investigate or not, the Court is of the opinion that the record does not permit any inference that the investigation was grossly inadequate or indicate a reckless disregard for the truth. In support of his argument to the contrary, the plaintiff points to some evidence indicating that contemporaneous reports of the Hoffa disappearance do not disclose with certainty that Hoffa was to meet Schultz.[9] while these are indications that Hoffa may not have planned to meet Schultz, they are outweighed by the large volume of newspaper and magazine stories to the contrary. They clearly do not establish that the story published by the defend-

---

8. It is difficult to see how this denial can carry much weight in proving the falsity of the statement. The article merely states that the Lenny whom Hoffa thought he would meet was Schultz. Thus, the story is merely an articulation of Hoffa's perception and whether, in fact, Schultz had planned to meet Hoffa is not necessarily related to the truth or falsity of the statement contained in the article.

9. Among the factors cited by the plaintiff are: (1) that Hoffa and Schultz were not close friends; (2) some employees of Linteau's Limousine Service had no conscious recollection of Hoffa mentioning Schultz's name; and (3) under hypnosis, one of Linteau's employees recalled that he was going to meet someone named "Lanny" or "Lennie."

ant was inherently improbable or that the defendant's investigation was grossly inadequate. Nor do they establish that the defendants or their agents were aware of any facts which would give rise to a duty to investigate.

This is especially true when one considers this evidence in light of the alleged defamatory statement which is prefaced by the word "probably." The use of this word indicates a degree of doubt, which may or may not have resulted from facts such as those raised by the plaintiff in his brief. Thus, the fact that there were a few contemporaneous accounts of the Hoffa disappearance which cast some doubt on whether Hoffa thought he was to meet Schultz does not detract from the article since the article clearly recognized that the matter was not one of certainty.

Another reason for finding no duty to investigate in this case is that the plaintiff has failed to show how such an investigation would have turned up any evidence contrary to facts reported in the stories relied on by Mr. Velie. The sources relied on were clearly reputable publications, many of which reported the same facts and details regarding the identity of the persons Hoffa thought he was going to meet. Given this, it is impossible for the Court to conclude that there was any duty on the part of Mr. Velie to conduct an independent investigation, or that his investigation was grossly inadequate.

The cases relied on by the plaintiff in support of his theory are inapplicable to the fact situation before the Court. In *Alioto v. Cowles Communication, Inc.,* 430 F.Supp. 1363 (N.D.Cal.1977), the Court held that where the source for an article was not credible, the failure to pursue an obvious avenue of corroboration could be regarded as evidence of reckless disregard for the truth. In this case, however, the sources relied on by the author were reputable publications and there is no reason to believe that he should have attempted to corroborate them elsewhere.

The plaintiff also relies on *Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2nd Cir. 1969), which held:

Reliance upon newspaper articles, books, and campaign literature and upon accurate reprinting of another's letter are only factors which, with other factors, are probative of whether the publisher of cumulated material was motivated by actual malice when he caused the full material to be published. Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports.

■ The Court agrees that reliance on the reports of others does not automatically shield one from liability. In this case, however, such reliance was clearly justified and not probative of malice. The reports relied on were almost uniform in the way they presented the facts, the facts reported were not inherently improbable, and there were no obvious reasons to doubt the reports' veracity. Therefore, the fact that the defendant relied on other newspaper and magazine reports is insufficient to raise a question of fact with respect to the issue of malice in this case.

The plaintiff's reliance on Michigan cases is also misplaced. In *Tumbarella v. Kroger Company,* 85 Mich.App. 482, 271 N.W.2d 284 (1978), the plaintiff alleged that she was libeled by a letter circulated by her employer saying that she was discharged for stealing. The Court held that a fact question was presented because her version of the story as related to her employer exonerated her and the employer had refused to prosecute her. While in this case Mr. Schultz has denied that he was going to meet Hoffa, this is not enough to present a question of fact with respect to malice absent the type of inconsistent actions on the part of the defendant which occurred in *Tumbarella, supra.*[10] Furthermore, as noted earlier, the

---

10. In *Peisner, supra,* the Court also found that a contradictory statement made by the author

was sufficient to create a question of fact regarding malice.

fact that Schultz has denied that he was to meet Hoffa, is not necessarily related to the alleged defamation which dealt with who Hoffa thought he was going to meet.

More fundamentally, the Court is of the opinion that in a situation such as this, the plaintiff's denial is insufficient to present a question of malice where the uncontested record shows that the author relied on a vast array of reliable journalistic sources in publishing the story. Cf. *Parks v. Johnson,* 84 Mich.App. 162, 269 N.W.2d 514 (1978).

Finally, the Court is of the opinion that the other factors cited by the plaintiff are insufficient to raise a question of fact regarding malice. The fact that the defendant has subsequently published essentially the same facts in a book is more indicative of a belief in the truth of the story than it is of malice. Similarly, the Court is of the opinion that the words of the article do not give rise to an inference of malice.

The only circumstance which gives the Court some concern in granting this motion is the fact that the defendant has refused to supply certain discovery material and has moved for a protective order. Essentially the defendant has refused to supply two categories of information. The first category consists of a memorandum prepared for defense counsel by an employee of the defendant after the commencement of the litigation. It does not appear that this information would be relevant to any issue raised by the motion for summary judgment and the plaintiff makes no argument to the contrary. As a result, the Court is of the opinion that it may decide the motion for summary judgment in the defendant's favor without resolving this dispute.

The second category of disputed discovery material is more troublesome. This involves the disclosure of certain of the author's confidential sources for the story, some of whom mentioned the name of Leonard Schultz. The defendant had objected to identifying these sources or the information they supplied on the basis of a First Amendment privilege. The plaintiff correctly points out that many courts have refused to find such a privilege. See e. g., *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631 (1974), cert. dismissed 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Garland v. Torre,* 259 F.2d 545 (2nd Cir. 1958); *Anderson v. Nixon,* 444 F.Supp. 1195 (D.D. C.1978). Despite this, there seems to be a judicial policy against ordering an unnecessary disclosure of confidential sources. *Carey, supra; Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972) cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973).

In this case, the Court is of the opinion that the disclosure of confidential sources is unnecessary to a determination of whether Mr. Velie or Reader's Digest acted with malice. Although the plaintiff argues that the Court may assume that the information given Velie and others at Reader's Digest was contrary to that presented in the article, there is absolutely nothing in the record to support this conclusion. The affidavits of Velie and others employed by Reader's Digest disclose that there was no doubt in their minds regarding the truth of the story at the time it was published. Furthermore, the deposition of Mr. Velie, during which counsel for the plaintiff spent a great deal of time attempting to discover the identity of these confidential sources, discloses nothing that would indicate that the confidential informants provided information contrary to that reported in the article. In fact, the questioning at the deposition clearly shows that the informant confirmed or was the source for much of the information contained in the article.

Furthermore, although Velie's deposition makes it clear that Schultz's name was mentioned by at least one informant his testimony also establishes that the informant provided no information regarding the alleged libelous statement in this case; that being that Hoffa believed that Schultz was one of the persons he was to meet. In addition, Velie states in his deposition that no one, including his sources, ever told him that Schultz did not have a scheduled meeting with Hoffa. Thus, contrary to the plaintiff's assertions, it is apparent that dis-

**567**

closure of the identity of the sources and the information they provided would not give rise to any inference that Velie or anyone at Reader's Digest should have suspected that the story was false.

Based on this, the Court is of the opinion that the defendant's motion for summary judgment shall be granted without ordering disclosure of the identity of confidential sources. Such disclosure is clearly unnecessary in this case, and while the information may not be subject to a constitutional or evidentiary privilege, public policy is best served by protecting against the unnecessary disclosure of a reporter's confidential sources.

The Court's ruling is supported by *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), a case which involved an almost identical fact situation. In *Cervantes,* the defendant published an article which alleged that the plaintiff, the mayor of St. Louis, had ties to the underworld. As a public official, the plaintiff was required to show malice in order to prevail. Pretrial discovery disclosed that most of the story was based on information gathered from informants within the FBI and Justice Department. Despite the refusal of the defendant to identify these sources, the Court affirmed a summary judgment in its favor:

These arguments in behalf of compulsory disclosure of confidential news sources, when urged on behalf of a public official whose reputation and integrity have been assaulted on the basis of information supplied by those sources, do not strike us as frivolous. Especially is this so when much of the information supplied by the anonymous informants has been obtained from the private files of Government. Nevertheless, on the facts of this particular case, we believe that in his preoccupation with the identity of Life's news sources, the mayor has overlooked the central point involved in this appeal: that the depositions and other evidentiary materials comprising this record establish, without room for substantial argu-

ment, facts that entitled both defendants to judgment as a matter of law, viz., that, quite apart from the tactics employed in collecting data for the article, the mayor has wholly failed to demonstrate with convincing clarity that either defendant acted with knowing or reckless disregard of the truth. *Id.* at 992.

Although the Court in *Cervantes* recognized that most cases deciding the issue had failed to find a First Amendment privilege against disclosure of confidential sources, it cautioned against using a blind approach to the issue:

We are aware of the prior cases holding that the First Amendment does not grant to reporters a testimonial privilege to withhold news sources. But to routinely grant motions seeking compulsory disclosure of anonymous news sources without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of State libel laws. Such a course would also overlook the basic philosophy at the heart of the summary judgment doctrine. *Id.* at 992–993.

After setting forth the responsibility of a party opposing summary judgment to produce support in the record for its assertion that there is a genuine question of fact, the Court explained how this burden is to be applied to a case such as this:

Applying these rules to the case before us, the compulsory disclosure issue is drawn into clearer focus. Where there is a concrete demonstration that the identity of defense news sources will lead to persuasive evidence on the issue of malice, a District Court should not reach the merits of a defense motion for summary judgment until and unless the plaintiff is first given a meaningful opportunity to cross-examine those sources, whether they be anonymous or known. For only then can it be said that no genuine issue remains to be tried. Thus, if, in the course of pretrial discovery, an allegedly libeled plaintiff uncovers substantial evi-

568

dence tending to show that the defendant's published assertions are so inherently improbable that there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports, the reasons favoring compulsory disclosure in advance of a ruling on the summary judgment motion should become more compelling. Similarly, where pretrial discovery produces some factor which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion. The point of principal importance is that there must be a showing of cognizable prejudice before the failure to permit examination of anonymous news sources can rise to the level of error. *Mere speculation or conjecture about the fruits of such examination simply will not suffice.* *Id.* at 994 (emphasis supplied).

Applying this standard, the Court upheld the summary judgment for the defendant because, aside from his own statement, the plaintiff produced no evidence that the defendant entertained serious doubts about the truth of the article or that the story was inherently improbable.

Like the plaintiff in *Cervantes,* Mr. Schultz has produced no evidence that the article in question was inherently improbable or that the Reader's Digest published it with serious doubts about the truth of its contents. Consequently the Court is of the opinion that the defendant is entitled to a summary judgment without disclosure of Velie's confidential sources.

In summary, then, the Court grants the defendant's motion for summary judgment and a protective order. The plaintiff's motion to consolidate this case with Civil Action No. 8–70003 is moot.

An appropriate order shall be submitted.