### PEISNER v DETROIT FREE PRESS, INCORPORATED

1. LIBEL AND SLANDER—PUBLIC FIGURES—ACTUAL MALICE.

    Liability for defamation may not be imposed upon a newspaper or broadcaster without a showing of actual malice if the plaintiff is a public official or public figure; an individual should not be deemed a public personality for all aspects of his life absent clear evidence of general fame or notoriety in the community and pervasive involvement in the affairs of society.

2. LIBEL AND SLANDER—PUBLIC FIGURES.

    The fact that an attorney was appointed to handle a criminal appeal is not a sufficient basis for holding that he was a public figure for purposes of avoiding liability in a defamation action brought by the attorney against a newspaper.

3. LIBEL AND SLANDER—QUALIFIED PRIVILEGE—MATTERS OF PUBLIC INTEREST— QUESTION OF LAW.

    A newspaper has a qualified privilege to report on matters of public interest; however, whether a qualified privilege exists in a particular case is a question of law to be decided by the trial court based on the circumstances surrounding the publication.

4. LIBEL AND SLANDER—QUALIFIED PRIVILEGE—ACTUAL MALICE— KNOWLEDGE OF FALSITY.

    A plaintiff, in order to recover in a defamation action, must affirmatively prove actual malice on the part of the defendant where a qualified privilege exists; actual malice is established by proof that the defamatory statement upon which the action

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 50 Am Jur 2d, Libel and Slander §§ 122, 123.

    What constitutes actual malice, within Federal constitutional rule requiring public officials and public figures to show actual malice. 20 ALR3d 988.

    Who is public official or otherwise within the Federal constitutional rule requiring public officials to show actual malice. 19 ALR3d 1361.

    Who is "public figure" in the light of Gertz v Robert Welch, Inc (1974). 75 ALR3d 616.

[3] 50 Am Jur 2d, Libel and Slander §§ 251–253.

[5, 6] 73 Am Jur 2d, Summary Judgment §§ 26, 28–30, 32–36.

is based was made with knowledge that it was false or with reckless disregard of whether it was false or not.

5. JUDGMENT—SUMMARY JUDGMENT—FAILURE TO STATE ISSUE—BENEFIT OF DOUBT— COURT RULES.

Affidavits, pleadings, depositions, admissions and other documentary evidence must be considered by a court when considering a motion for summary judgment based upon failure to state a genuine issue as to any material fact, and the benefit of every reasonable doubt must be given to the party opposing the motion (GCR 1963, 117.2[3]).

6. JUDGMENT—SUMMARY JUDGMENT—FAILURE TO STATE ISSUE—EVIDENTIARY SUFFICIENCY—COURT RULES.

A motion for summary judgment for failure to state a genuine issue as to any material fact tests the evidentiary sufficiency of the opposing party's case (GCR 1963, 117.2[3]).

Appeal from Wayne, Peter B. Spivak, J. Submitted December 12, 1977, at Detroit. (Docket No. 77-2779.) Decided March 21, 1978.

Complaint by Balfour Peisner and Nora Peisner against the Detroit Free Press, Incorporated, and Louis Heldman for damages for libel. Summary judgment for defendants. Plaintiffs appeal. Reversed and remanded.

*Leroy W. Daggs* (by *Balfour Peisner,* of counsel), for plaintiffs.

*Kenneth Murray* and *Brownson Murray,* for defendants.

Before: N. J. KAUFMAN, P. J., and BRONSON and D. E. HOLBROOK, JJ.

PER CURIAM. Plaintiff Balfour Peisner, a Detroit attorney, and his wife, Nora S. Peisner, filed suit against defendants Detroit Free Press and Louis Heldman, its reporter, on December 10, 1973, in

connection with the newspaper's publication of an article and an editorial concerning plaintiff Balfour Peisner's representation of an indigent criminal defendant.

The article, which appeared in the November 20, 1973, edition of the Free Press, stated that Detroit Recorder's Court Judge Patrick O'Brien had appointed Peisner, his longtime friend and former campaign manager, to handle the appeal of an indigent defendant's conviction for manslaughter after a trial at which he had presided. Peisner's appeal in that case, according to the article, was his first criminal appeal and failed to raise the issue of the trial judge's prejudicial misconduct. The article stated that the judge had called the defendant's trial attorney a liar and questioned his competence and ethics in the presence of the jury. The article also reported that the defendant had struggled in vain to have Peisner removed as his appointed counsel on appeal and that Peisner had said that he failed to raise the issue of the judge's conduct on appeal because he did not wish to "sling mud".

On November 23, 1973, plaintiff Balfour Peisner wrote a letter to the editor of defendant Detroit Free Press demanding that the paper print a retraction of the article.

On December 1, 1973, defendant newspaper printed an editorial deploring the "buddy system" of justice whereby judges appoint their friends to handle the cases of indigent defendants. Detroit Recorder's Court Judge Patrick O'Brien, said the editorial, had appointed Balfour Peisner, his former campaign manager, to handle the appeal of a defendant convicted before him at a trial which involved the possible misconduct of the judge. In handling the appeal, said the Free Press, Peisner

failed to mention the fact that the judge had called the defendant's previous attorney a liar.

Plaintiff's complaint alleged, *inter alia,* that the defense attorney had not been called a liar or his competence and ethics questioned in the jury's presence and that the article was therefore untrue. It asserted that Balfour Peisner and Louis Heldman had a conversation regarding the controversy before publication of the article at which time Louis Heldman admitted that the only misconduct at the trial was that of the defense attorney and Balfour Peisner explained that misconduct by defense counsel was not grounds for appeal.

Defendants' answer stated that Recorder's Court Judge Patrick O'Brien's remarks may or may not have been made in the jury's presence but that during the trial the judge did attack defense counsel's competence and ethics and that, therefore, the article's accusation that Peisner had failed to raise the issue of judicial misconduct on appeal was true. The answer denied that defendant Heldman ever admitted that the misconduct at trial was wholly that of defense counsel and alleged that plaintiff Peisner had attempted to elicit such a response from Heldman and had explained his failure to raise the issue on appeal with the statement, "I didn't want to sling mud". The answer also denied that the article and editorial were published maliciously and alleged that both were true.

The answer raised affirmative defenses of constitutional privilege and qualified privilege on the grounds that the controversy was a matter of widespread public interest and also averred that plaintiffs had failed to allege facts from which malice could be inferred.

On June 14, 1977, after three and one-half years of discovery and disputes, defendants filed a motion for summary judgment on the grounds that the complaint failed to state a cause of action and there existed no genuine issue of any material fact. Specifically, the motion asserted that the matters reported in the article and editorial were true and that, in any event, their publication was privileged, plaintiffs having failed to allege sufficient facts to create a question of malice.

By his affidavit, submitted in support of the motion, Louis Heldman swore that he was told by counsel for the defendant, whose conviction plaintiff Peisner was appointed to appeal, that Recorder's Court Judge Patrick O'Brien had called him a liar in the presence and the absence of the jury and that the judge admitted calling defense counsel a liar several times on the record at the trial. Heldman further swore that he knew of no untruth or inaccuracy in the story which he prepared and that he bore plaintiff Peisner no ill will or malice.

In another affidavit, the managing editor of the Free Press swore that the article and editorial were printed as a matter of public interest in the administration of justice, were based on the knowledge and information available to the defendants at the time of publication, were believed to be true and were not motivated by any animosity toward plaintiff.

Plaintiffs' answer to defendants' motion for summary judgment asserted that the allegations contained in plaintiffs' complaint that Louis Heldman had admitted to Peisner that defense counsel and not the judge had been at fault and that Peisner's letter of November 23, 1973, placed defendants on notice that the article was untrue were sufficient

to create a substantial question of fact concerning the existence of malice.

In an affidavit supporting plaintiffs' answer, Balfour Peisner swore that nowhere in the transcript was defense counsel called a liar in the jury's presence and that Louis Heldman admitted that defense counsel and not the trial judge had been guilty of misconduct. Peisner further stated that defendants took no precautions to verify the article before publication.

The trial judge granted defendants' motion for summary judgment on June 30, 1977, holding that the publications in the instant case were qualifiedly privileged since the prior lawsuit was a matter of "public interest", that plaintiff Balfour Peisner was a "public figure" at the center of a public controversy and that plaintiffs had made no showing of affirmative facts which would indicate that defendants acted with actual malice.

I.

Defendants contend that plaintiff is a "public figure" within the meaning of *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974). In *Gertz,* the U. S. Supreme Court held that liability for defamation may not be imposed upon a newspaper or broadcaster without "actual malice" if the plaintiff is a public official or public figure. The stated reason for this distinction was that:

"Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in

protecting them is correspondingly greater." 418 US at 344 (footnote omitted).

In this context, the Court described "public fig-ures":

"For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of par-ticular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." 418 US at 345.

Specifically, the Court addressed whether Gertz could be classified as a public figure:

"Petitioner has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame or notoriety in the community. None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population. We would not lightly assume that a citizen's participa-tion in community and professional affairs rendered him a public figure for all purposes. Absent clear evi-dence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

"In this context it is plain that petitioner was not a public figure. He played a minimal role at the coroner's

inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome. We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation." 418 US at 351–352.

Plaintiff in the case at bar is in a situation similar to Gertz. He is a well-known attorney, although certainly not a celebrity. He has not sought out publicity. Rather, the trial court's sole basis for holding that he was a public figure was the fact that he was appointed to handle a criminal appeal. This is an insufficient basis for holding plaintiff to be a "public figure". See, also, *Time, Inc v Firestone,* 424 US 448; 96 S Ct 958; 47 L Ed 2d 154 (1976); Anno., 20 ALR3d 988.

## II.

We affirm the trial court's holding that defendant had a qualified privilege to publish the articles in question. *Gertz v Robert Welch, Inc, supra,* held that:

"[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 US at 347 (footnote omitted).

We have discovered no post-*Gertz* cases defining the standard under which private plaintiffs may recover damages for libel in Michigan. We therefore turn to earlier decisions of Michigan courts.

For many years, Michigan courts have attempted to balance the respective rights of private individuals and those with an interest or duty to publish information about private individuals under the rubric of qualified privilege. The first expression of the qualified privilege doctrine appears in *Bacon v Michigan Central R Co,* 66 Mich 166, 170; 33 NW 181 (1887):

"Qualified privilege exists in a much larger number of cases. It extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

This definition has been repeated and applied in more recent cases. See, *e.g., Bostetter v Kirsch Co,* 319 Mich 547, 556–557; 30 NW2d 276 (1948); *Timmis v Bennett,* 352 Mich 355, 366; 89 NW2d 748 (1958); *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959). *Bufalino v Maxon Brothers, Inc,* 368 Mich 140; 117 NW2d 150 (1962).

Qualified privilege of a newspaper to report on matters of public interest was held to exist in *Lawrence v Fox, supra.* Although that case involved an article charging a public official with fraud and corruption, it is clear that it was not limited to publications concerning public officials:

"This defense rests upon considerations of public policy. 'The great underlying principle upon which the doctrine of privileged communication stands,' we held in *Bacon v. Michigan Central R. Co.,* 66 Mich 166, 169, 170, 'is public policy. This is more especially the case with absolute privilege, where the interests and necessities of society require that the time and occasion of the publication or utterance, even though it be both false

and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good. It rests upon the same necessity that requires the individual to surrender his personal rights and to suffer loss for the benefit of the common welfare.' The term privilege, then, having such origins, relates to a situation or occasion in which the importance of the criticism uttered by the defendant (for reasons to which we will in due course advert) justifies a modification, or, indeed, a withdrawal, of the protection normally afforded our citizens.

\* \* \*

"The privilege thus afforded is not, however, as the mathematicians would put it, a constant. It varies with the situation, with what is regarded as the importance of the social issues at stake. At one extreme we have loose gossip, thoughtless or malevolent. Here the damage to the individual's reputation is balanced only against the social desirability of the unbridled tongue, the frenetic lashings of the scorpion's tail. Under the statutes of Edgar and Canute the tongue itself was forfeited. Modern law is more lenient. We class it simply as a case of 'no privilege' and leave the parties to their proofs. At the other extreme are those occasions wherein the social interest involved in publication is so great as to immunize even deliberately malicious attacks upon one's character. Thus of judicial utterances, 'A communication absolutely privileged—as, for instance, words spoken by a judge in his judicial capacity in a court of justice—is not actionable, even though spoken maliciously.' \* \* \* So, also, of words spoken in the course of legislative debate.

"Considerations of social policy similar in principle, but of lesser intensity, result in a privilege not absolute but conditional, or, as sometimes put, qualified, or defeasible. These situations are of a great variety, all of them responding more or less directly to Baron Parke's famous statement in *Toogood v. Spyring* (Ex 1834), 1 CM&R 181, 193 (149 Eng Rep 1044) that a publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' These are the

occasions in which one has not an absolute but a limited immunity to speak or publish words in and of themselves defamatory." 357 Mich at 137–139 (footnotes and citations omitted).[1]

Also relevant to the case at bar is *Weeren v Evening News Association,* 2 Mich App 74; 138 NW2d 526 (1965), *rev'd on other grounds,* 379 Mich 475; 152 NW2d 676 (1967). The Court of Appeals held in that case that the defendant broadcaster was qualifiedly privileged to televise a documentary film of public interest concerning a private plaintiff.[2]

The question of whether a qualified privilege exists in a particular case is one of law to be decided by the trial court, based on the circumstances surrounding the publication. *Lawrence v Fox, supra,* at 139–140, *Weeren v Evening News Association, supra,* at 77. The trial judge in the case at bar held that the public's interest in the administration of justice gave rise to a qualified privilege to report on events affecting a judicial proceeding. We find no error in this holding on the facts of this case.

### III.

Where a qualified privilege exists, plaintiff, in order to recover, must affirmatively prove actual

[1] The majority opinion was joined by three of the six justices participating. Three others concurred in result. Subsequent cases, however, have indicated approval of it. *See Weeren v Evening News Association,* 2 Mich App 74, 77; 138 NW2d 526 (1965), *rev'd on other grounds,* 379 Mich 475; 152 NW2d 676 (1967).

[2] In *Weeren,* the plaintiff's action was based on the televising by defendant of a film entitled "A Bell for Okinawa", which was based on a true story of how a leper colony in Okinawa obtained a bell free of charge from a company in West Berlin. Plaintiff claimed to be the general manager of the West Berlin company at the time. It is apparent that plaintiff was not a "public figure", as defined in *Gertz.*

malice on the part of the defendant. *Lawrence v Fox, supra; Weeren v Evening News Association, supra.*

*New York Times v Sullivan,* 376 US 254, 280; 84 S Ct 710; 11 L Ed 2d 686; 95 ALR2d 1412 (1964), held that actual malice is established by proof that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not".

In reviewing a 117.2(3) summary judgment motion, the following principles apply:

"Motions for summary judgment under GCR 1963, 117.2(3) are not proper unless no genuine issue as to any material fact remains. In passing on the motion, benefit of every reasonable doubt must be given to the party opposing the motion. Summary judgment under this provision is designed to test whether factual support exists for the claim made. Affidavits, pleadings, depositions, admissions, and other documentary evidence must be considered by the court. Courts are liberal in finding that a genuine issue does exist, in order not to infringe upon a party's right to trial of disputed factual issues. *Rizzo v Kretschmer,* 389 Mich 363, 370–374; 207 NW2d 316 (1973), *Wynglass v Prudential Life Ins Co,* 68 Mich App 514, 516; 242 NW2d 824 (1976), *McLaughlin v Consumers Power Co,* 52 Mich App 663, 666; 218 NW2d 122 (1974).

"On the other hand, we note that a party opposing the motion for summary judgment based on subrule 117.2(3) must come forward with some proof to establish the existence of a genuine issue of material fact. *Durant v Stahlin,* [375 Mich 628; 135 NW2d 392 (1965)], *supra* at 638–639, 655–656; *Rizzo v Kretschmer, supra* at 372." *Bob v Holmes,* 78 Mich App 205, 211–212; 259 NW2d 427 (1977).

A 117.2(3) summary judgment motion tests the evidentiary sufficiency of the opposing party's case. Therefore, while the opposing party is to be given

the benefit of any reasonable doubt as to the existence of an issue of fact, his allegations of the existence of an issue of fact are not sufficient. The opposing party must provide facts supporting his allegations. Factual support may be supplied by affidavits, pleadings, depositions and other documentary evidence.

In the case at bar, plaintiff's allegations that there exists an issue of fact as to malice are therefore insufficient. We must examine the *facts* plaintiff relies on to determine if an issue does exist. The pleadings and affidavit of plaintiff set forth the following alleged facts upon which plaintiff relies as raising an issue as to malice: 1) Heldman's article stated that Recorder's Court Judge Patrick O'Brien called defense counsel a liar in the presence of the jury, but the transcript showed that the incident occurred before the jury had been selected; 2) Heldman's article stated that judicial misconduct was an issue which should have been raised on appeal, but Heldman had previously stated to plaintiff that any misconduct was on the part of defense counsel, not the trial judge; 3) the article quotes Peisner as stating that he did not raise the judicial misconduct issue on appeal because he didn't want to "sling mud", but that Peisner never made that statement; 4) defendant Detroit Free Press took no precautions to verify the facts as stated by Heldman; 5) the Free Press repeated its allegations in an editorial after Peisner had demanded a retraction and pointed out the alleged factual errors in the article.

(1), (4) and (5) are insufficient by themselves to raise an issue of malice. (1) is insufficient because it is irrelevant whether the statement was made in the presence of the jury or not; the real question is whether the reporter knew whether it was in the

presence of the jury or not. (4) is insufficient because the newspaper's failure to verify facts alone does not indicate malice. See, *e.g., St Amant v Thompson,* 390 US 727; 88 S Ct 1323; 20 L Ed 2d 262 (1968); *New York Times v Sullivan, supra.* (5) is insufficient because it is not alleged that any inaccurate statements were repeated in the editorial. In fact, the editorial avoids mention of any allegation that the judge called defense counsel a liar in the presence of the jury or that Peisner stated that he did not raise the misconduct issue on appeal because he didn't want to "sling mud".

However, (2) and (3) do raise an issue of fact as to malice. These allegations indicate that Heldman wrote the article criticizing plaintiff's failure to raise an issue on appeal knowing that judicial misconduct was not a meritorious issue. Of course, Heldman in his deposition denied the facts as alleged by plaintiff and we express no opinion on the credibility of the affiants. Plaintiff, however, has raised an issue of material fact and summary judgment under 117.2(3) was therefore improper.

Reversed and remanded for trial. No costs, a public question being involved.