GAYNES v ALLEN

Docket No. 61172. Submitted February 3, 1983, at Detroit.—Decided
August 16, 1983.

Dr. Ernest Gaynes brought an action for libel against Dr. James
H. Allen, Physicians Education Network, Inc., and others con-
cerning published statements about plaintiff's competency in
his profession. The statements were published by Physicians
Education Network, Inc., whose purpose is informing ophthal-
mologists and members of the public as to matters which affect
the quality of health care and the qualifications of health care
providers. The Wayne Circuit Court, Myron H. Wahls, J.,
directed a verdict for defendants, holding that defendants had a
qualified privilege and that there was no evidence of malice.
Plaintiff appealed. *Held:*

1. A qualified privilege extends to all communications made
in good faith upon any subject matter in which the party
communicating has an interest, or in reference to which he has
a duty, whether legal, social or moral, to a person having a
corresponding interest or duty. Defendants had a qualifed
privilege.

2. A private individual who seeks recovery from a media
defendant for defamatory falsehoods which relate to a matter
of legitimate public concern must prove that the defendant
published the statements with knowledge of their falsity or
with reckless disregard for their truth or falsity. Reckless
disregard is shown by evidence that the statements were pub-
lished with a high degree of awareness of probable falsity and
that the defendant in fact entertained serious doubts as to the
truth of the publication. There was no evidence of defendants'
knowledge of the falsity of the statements or reckless disregard
for their truth or falsity.

Affirmed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 50 Am Jur 2d, Libel and Slander §§ 195-198.
Testimony before or communications to private professional soci-
ety's judicial commission, ethics committee, or the like, as privi-
leged. 9 ALR4th 807.
[2] 50 Am Jur 2d, Libel and Slander § 251.

1. LIBEL AND SLANDER — QUALIFIED PRIVILEGE.

    A qualified privilege extends to all communications made in good faith upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, whether legal, social or moral, to a person having a corresponding interest or duty.

2. LIBEL AND SLANDER — PRIVATE PERSONS — MALICE — QUALIFIED PRIVILEGE — RECKLESS DISREGARD.

    A private individual who seeks recovery from a media defendant for defamatory falsehoods which relate to a matter of legitimate public concern must prove that the defendant published the statements with knowledge of their falsity or with reckless disregard for their truth or falsity; reckless disregard is shown by evidence that the statements were published with a high degree of awareness of probable falsity and that the defendant in fact entertained serious doubts as to the truth of the matters published.

*Fieger & Fieger, P.C.* (by *Bernard J. Fieger*), for plaintiff.

*Kerr, Russell & Weber* (by *Richard D. Weber* and *James R. Case*), for defendants.

Before: D. F. WALSH, P.J., and BEASLEY and T. R. THOMAS,* JJ.

D. F. WALSH, P.J. Plaintiff, Dr. Ernest Gaynes, brought this libel action against defendants, James H. Allen, Physicians Education Network, Inc., George P. Russell, and Russell, Brantley and Peterson, Inc., for the publication of statements concerning plaintiff's competency in his profession of optometry. Defendants' motion for directed verdict of no cause of action was granted. Plaintiff appeals. We affirm.

Defendant, Physicians Education Network, Inc., is a nonprofit organization of ophthalmologists which exists for the purpose of informing its mem-

* Circuit judge, sitting on the Court of Appeals by assignment.

bers and the public as to matters which affect the qualify of health care and, particularly, as to the qualifications of health care providers. The organization publishes a newspaper, *The PEN,* which is distributed to ophthalmologists and other interested persons, including government officials. In the newspaper's October 1, 1977, edition, an article entitled "Michigan Oral Surgeon—'A Horrible Price to Pay for Someone's Incompetence' " was published. Although the article did not contain plaintiff's name, it clearly concerned plaintiff's optometric treatment of oral surgeon Herbert J. Bloom. The article, written by Dr. Bloom, lodged serious charges of professional negligence against plaintiff, attributing Dr. Bloom's vision loss to plaintiff's response to Dr. Bloom's eye problems.[1] A synopsis of the article was published in a pamphlet entitled "101 Reasons * * * Why Optometrists Should Not be Permitted by Law to Perform Medical Functions". The pamphlet was compiled by defendant Physicians Education Network, Inc., in March, 1980, and contained accounts of eye damage allegedly arising out of optometric mismanagement and failure to refer.[2]

According to plaintiff, the article contained numerous misstatements concerning Dr. Bloom's condition and plaintiff's conduct. He contends that, as a result of publication of the article, his professional reputation has suffered greatly.

[1] Dr. Bloom's malpractice action against plaintiff ended in a jury verdict of no cause of action prior to plaintiff's commencement of the instant libel action.

[2] Plaintiff originally named Dr. Bloom as a party defendant in this action. His claim against Dr. Bloom was settled before trial. Defendant Allen is an ophthalmologist, a member of the Physicians Education Network, Inc., and an editor of *The PEN.* Defendant Russell is executive director of the network and president of defendant Russell, Brandley and Peterson, Inc., which acts as the network's management consulting firm.

On the morning of the third day of jury trial, defendants asked the court to direct a verdict in their favor. The court agreed that the allegedly libelous statements had been cloaked with a "qualified privilege" and that defendants were entitled to a directed verdict because plaintiff had presented no evidence of "actual malice".

The issue presented for our consideration is: What is the appropriate standard of liability in Michigan for the defamation by the media of private persons when the subject matter of the defamatory statement is a matter of legitimate public interest? Proper resolution of this issue requires that our initial focus be on several decisions of the United States Supreme Court.

In *New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), the Supreme Court, attempting to reconcile the law of defamation with the First Amendment, held that a publisher of defamatory falsehoods about a public official is constitutionally protected from liability for defamation unless "actual malice" is proved. That is, the defamed person must prove knowledge of the statement's falsity or reckless disregard of whether it is true or not. The Court extended this constitutional principle to cases involving defamed public figures in *Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967).

A plurality of the justices in *Rosenbloom v Metromedia, Inc,* 403 US 29; 91 S Ct 1811; 29 L Ed 2d 296 (1971), concluded that the *New York Times* protection should extend to defamation of private persons if the defamatory statements concerned matters of general or public interest.

In *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), the Court again considered whether a publisher of defamatory

falsehoods about a private individual may claim a constitutional privilege against liability for such statements. The Court identified the competing considerations at issue in development of the appropriate standard of liability: the constitutional concern to avoid media self-censorship and the legitimate state interest in the compensation of individuals for wrongful injury to reputation. The Court rejected the "public or general interest" test of the *Rosenbloom* plurality, and declined to extend the constitutional mandate of *New York Times* to defamation actions by private individuals, holding that:

"so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 US 347.

The Court further held that plaintiffs in private defamation actions may recover damages only for actual injury and may not recover presumed or punitive damages unless they prove actual malice as defined in *New York Times.* 418 US 350.

The states have responded in various ways to the *Gertz* decision. Several have adopted a negligence standard of liability for publishers of defamatory falsehoods about private individuals. See, *e.g., Taskett v King Broadcasting Co,* 86 Wash 2d 439; 546 P2d 81 (1976); *Miami Herald Publishing Co v Ane,* 423 So 2d 376 (Fla App, 1982). Others have extended the actual malice test of *New York Times* to private defamation actions. See, *e.g., Diversified Management, Inc v Denver Post, Inc,* 653 P2d 1103 (Colo, 1982).[3]

---

[3] *Gertz* has generated much commentary. See, *e.g.,* Eaton, *The American Law of Defamation Through* Gertz v Robert Welch, Inc,

In Michigan, the *New York Times* standard has been extended to actions brought by private individuals to recover from media defendants for defamatory falsehoods concerning matters of public interest. *Peisner v Detroit Free Press, Inc,* 82 Mich App 153; 266 NW2d 693 (1978). Such plaintiffs must prove that the defendant published the defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.,* p 164.

We are persuaded that the standard of liability adopted by the *Peisner* Court is appropriate, as that standard is most compatible with Michigan authority prior to *Gertz.*

In reaction against the harshness of the common-law standard of strict liability for publication of defamatory falsehoods, Michigan has long recognized a broad "qualified privilege" to discuss matters of public concern. See *Miner v Detroit Post & Tribune Co,* 49 Mich 358; 13 NW 773 (1882), and *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959). In *Bacon v Michigan C R Co,* 66 Mich 166, 169-170; 33 NW 181 (1887), the Supreme Court discussed the nature of qualified privileges:

---

and Beyond: An Analytical Primer, 61 Va L Rev 1349 (1975); Borrus, *Defamation and the First Amendment: Protecting Speech on Public Issues,* 56 Wash L Rev 75 (1980); Swerdlow, *Defamation, the Private Individual and Matters of Public Concern: a Proposed Resolution for Florida,* 32 U Fla L Rev 545 (1980); Christie, *Underlying Contradictions in the Supreme Court's Classification of Defamation,* 1981 Duke LJ 811; Gerdts and Wolff, *State Court Reactions to* Gertz v Robert Welch, Inc: *Inconsistent Results and Reasoning,* 29 Vanderbilt L Rev 1431 (1976); Collins and Drushal, *The Reaction of the State Courts to* Gertz v Robert Welch, Inc, 28 Case Western L Rev 306 (1978); McKay, *Libel and Slander: The Constitution and the Private Figure in Oklahoma,* 30 Okla L Rev 686 (1977); Gutman, *The Attempt to Develop an Appropriate Standard of Liability for the Defamation of Public and Private People: The Supreme Court and the Federalization of Libel Law,* 10 N C Central LJ 201 (1978); Spencer, *Establishment of Fault in Post-*Gertz *Libel Cases,* 21 St Louis LJ 374 (1977); Hecht, *The Defamation Action for Private Individuals: The New Fault Standards,* 22 S Dak L Rev 163 (1977).

"The great underlying principle upon which the doctrine of privileged communications stands, is public policy. * * * [Qualified privilege] extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

It is the occasion, and not the language, of the communication which determines the question of privilege. *Lawrence v Fox, supra,* pp 139-140. It is for the court to determine if the occasion upon which defamatory words were spoken was a privileged occasion. *Id.,* p 144; *Bacon, supra,* p 173.

We agree with the observation of the federal district court that, while Michigan Supreme Court cases have generally involved plaintiffs who would be considered public officials or public figures, there has been no indication that the legal principles espoused by the Court were to be limited to such cases. *Schultz v Reader's Digest Ass'n,* 468 F Supp 551, 560-562 (ED Mich, 1979). See, *e.g., Lawrence v Fox, supra,* p 145. See also *Schultz v Newsweek, Inc,* 668 F2d 911 (CA 6, 1982).

In this case, the trial court ruled, and we agreed, that defendants had a qualifed privilege to publish the article which prompted plaintiff to file this lawsuit. The purpose of defendant Physicians Education Network, Inc., is to disseminate information as to matters of health care. The published information related to treatment rendered by plaintiff optometrist, who allegedly failed to recognize a medical problem beyond his level of competence. Ophthalmologists and the general public have a vital interest in the proper delivery of eye care services and in being informed of the level of

competence of health care deliverers. The issue to which the allegedly defamatory article addressed itself is one deserving of robust public debate. We hold the published information was a matter of legitimate public concern and that defendants had a qualified privilege to publish it.

The significance of a finding of qualified privilege was discussed by the Supreme Court in *Bacon v Michigan C R Co, supra,* pp 172-173:

"The meaning in law of a privileged communication is that it is made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact * * *. In actions for defamation, malice is an essential element in the plaintiff's case. But in these cases the word "malice" is understood as having two significations; one, its ordinary meaning of ill will against a person, and the other its legal signification, which is a wrongful act done intentionally, without just cause or excuse. These distinctions have been denominated *malice in fact* and *malice in law.* The first implies a desire and an intention to injure; the latter is not necessarily inconsistent with an honest purpose, but, if false and defamatory statements are made concerning another without sufficient cause or excuse, they are legally malicious, and in all ordinary cases malice is implied from the defamatory nature of the statements and their falsity. The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact,—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff."

Also see *Lawrence v Fox, supra,* pp 141-142:

"The conditional privilege, asserted by defendants in the case before us, is, as the terminology suggests, a

privilege subject to defeasance, subject to a condition, the condtition being its exercise without abuse. Abuse may take place in many ways. It may arise from lack of good faith in making the publication, *Mundy v Hoard,* 216 Mich 478, the primary motive being the gratification of personal hostility, spite, or ill-will, or, as sometimes put, *Fortney v Stephan* [237 Mich 603; 213 NW 172 (1927)] publication 'with actual malice.' Abuse, also, may arise 'if the extent of its publication be excessive,' *Smith v Smith,* 73 Mich 445, 446 (3 LRA 52; 16 Am St Rep 594).

\* \* \*

"The fact, then, that it is determined that the occasion is conditionally privileged does not mean that the publisher (whether newspaper or other) has carte blanche to deal recklessly with the most jealously guarded possession of a public official, or, indeed, of any citizen, his good reputation. Yet the conditional privilege does afford the publisher a degree of protection. He is not liable for absolute truth, it being required only, as we held in *Powers v Vaughan,* 312 Mich 297, 305, quoting *McAllister v Detroit Free Press,* 76 Mich 338, 356 (15 Am St Rep 318), that the statement made be 'honestly believed to be true, and published in good faith.' "

In *Peisner v Detroit Free Press, supra,* pp 163-164, the Court, without discussion, adopted the *New York Times* standard of actual malice as equivalent to the common-law "actual malice" to which the Supreme Court referred in *Lawrence v Fox, supra,* p 142. The common-law concept of malice, however, is most commonly equated with ill will or spite. Emphasis at common law was on the motive of the defendant in publishing the defamatory statement. See *Bacon v Michigan C R Co, supra,* p 173. Following *Gertz v Robert Welch, Inc, supra,* the constitutional validity of the traditional test is questionable. See Barnes, *The Constitutional Fault Test of* Gertz v Robert Welch, Inc,

*and the Continued Viability of the Common Law Privileges in the Law of Defamation,* 20 Ariz L Rev 799, 805, 807 (1978).[4]

We are persuaded that the *Peisner* approach is the most satisfactory accommodation between Michigan's longstanding recognition of a qualified privilege to publish matters of public concern and the constitutional standard announced in *Gertz v Robert Welch, Inc, supra.* Application of the *New York Times* standard to cases involving traditional qualified privilege most adequately preserves the substance of such privilege. We further observe that the *New York Times* standard is not entirely dissimilar to the standard enunciated in *Lawrence v Fox, supra.* See *Schultz v Reader's Digest Ass'n, supra,* p 563.

Thus, we hold that a private individual who seeks recovery from a media defendant for defamatory falsehoods which relate to a matter of legitimate public concern may not recover without proof that the defendant published the statements with knowledge of their falsity or with reckless disregard for their truth or falsity.[5]

---

[4] We disagree with *Postill v Booth Newspapers,* 118 Mich App 608, 619-620; 325 NW2d 511 (1982), *lv den* 417 Mich 1050 (1983), to the extent that the panel, in dicta, recognized the continued viability of the notion of common-law ("ill will") malice.

[5] Our holding is consistent with the view of the American Law Institute:

"'* * * one who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he

"(a) knows the matter to be false, or

"(b) acts in reckless disregard as to its truth or falsity."

Restatement Torts, 2d, § 600, p 288.

In the absence of an occasion giving rise to a privilege, the Institute proposes that one be liable for publication of false and defamatory communications concerning a private person if he or she acts with knowledge of the statement's falsity and of its defamatory character, in reckless disregard of those matters, or *negligently* in failing to ascertain them. Restatement Torts, 2d, § 580B, pp 221-222.

We restrict our holding to the facts presented, and express no

In this case, the trial court found that plaintiff had not presented evidence which would justify submission of the actual malice issue to the jury.

As defendants observe, there was no evidence of "knowing falsehood" in this case. In order to satisfy the "reckless disregard" test of actual malice, plaintiff was required to present evidence that the article was published with a "high degree of awareness of * * * probable falsity" and that defendants "in fact entertained serious doubts as to the truth" of the matters published. *Garrison v Louisiana,* 379 US 64, 74; 855 S Ct 209; 13 L Ed 2d 125 (1964); *St Amant v Thompson,* 390 US 727, 731; 88 S Ct 1323; 20 L Ed 2d 262 (1968).

We agree with the trial court that defendants were entitled to a directed verdict. There was no evidence from which the jury could have concluded that defendants entertained serious doubts about the truth of Dr. Bloom's article. On the contrary, defendant Russell diligently checked the credentials of the doctor who originally sought to bring attention to Dr. Bloom's case. After satisfying himself that that doctor's reputation for veracity was excellent, Russell turned his attention to Dr. Bloom. He discovered that Dr. Bloom enjoyed a good reputation in the medical community, that he had held numerous positions of responsibility in that community, and that he had been involved extensively with Project Hope. Russell was told of Dr. Bloom's unsuccessful malpractice action against plaintiff but was also told that plaintiff had raised a defense of Dr. Bloom's contributory negligence in that case.

We find that there was no evidence to suggest a reason to doubt the veracity of the sources of the

opinion concerning nonmedia defendants or purely private defamation.

challenged article. See *Schultz v Readers Digest Ass'n, supra,* p 565. Nor did the evidence raise any legitimate inference that the investigation which preceded publication was grossly inadequate or suggestive of a reckless disregard for the truth. *Id.,* p 564. The trial court's finding of no evidence of actual malice is affirmed.

Judgment for defendants is affirmed. No costs, a public question.