[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-10880

————————————————

D.C. Docket No. 2:13-cv-00817-WKW-WC


ROSA AND RAYMOND PARKS INSTITUTE
FOR SELF DEVELOPMENT,

Plaintiff-Appellant,

versus

TARGET CORPORATION,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama

————————————————

(January 4, 2016)

Before ROSENBAUM, JULIE CARNES, and DUBINA, Circuit Judges.

ROSENBAUM, Circuit Judge:

It was December 1, 1955.  Although more than a year had passed since the Supreme Court issued *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S. Ct. 686 (1954), invalidating *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138 (1896), and its separate-but-equal doctrine, change was slow to arrive in Alabama.

Rosa Parks had had enough.  After a long day of work, she boarded the bus in downtown Montgomery and took a seat.[1]  Once the bus filled up, some white men boarded and could find no seats.  *Id.* at 83.  So the bus driver demanded that Parks and some other African-Americans give their seats to the white men.  *Id.*

Though the other passengers yielded, Parks refused.  *Id.*  In later years, she explained, "[W]hen that white driver stepped back toward us, when he waved his hand and ordered us up and out of our seats, I felt a determination to cover my body like a quilt on a winter night."  Donnie Williams & Wayne Greenhaw, THE THUNDER OF ANGELS:  THE MONTGOMERY BUS BOYCOTT AND THE PEOPLE WHO BROKE THE BACK OF JIM CROW 48 (Chicago Rev. Press 2005).  Upon seeing Parks continuing to sit, the bus driver persisted, asking Parks if she was going to stand.  Juan Williams, EYES ON THE PRIZE:  AMERICA'S CIVIL RIGHTS YEARS, 1954-1965 66 (Penguin Books 1987).

---

[1] Interview by Sidney Rogers with Rosa Parks (Apr. 1956), *in* DAYBREAK OF FREEDOM: THE MONTGOMERY BUS BOYCOTT 82 (Stewart Burns ed., 1997).

Parks said, "No, I'm not." *Id.* And when the bus driver threatened to call the police, Parks calmly answered, "You may do that." *Id.* The police arrived and arrested Parks for refusing to relinquish her bus seat to a white passenger in accordance with Montgomery city law. *Id.* at 87.

Parks's courageous act inspired the Montgomery Bus Boycott and served as the impetus for the modern Civil Rights Movement, transforming the nation.[2] *Id.* In response to Parks's arrest, for 381 days, 42,000 African-Americans boycotted Montgomery buses, until the United States Supreme Court held the Montgomery segregation law unconstitutional and ordered desegregation of the buses. Act of May 4, 1999, Pub. L. No. 106-26, § 1 (4), (5), 113 Stat. 50, 50 (awarding Parks the Congressional gold medal).

Parks's refusal to cede ground in the face of continued injustice has made her among the most revered heroines of our national story; her role in American history cannot be over-emphasized. Indeed, the United States Congress has recognized Parks as the "first lady of civil rights" and the "mother of the freedom movement," and it has credited Parks with "ignit[ing] the most significant social movement in the history of the United States." *Id.* at § 1(2).

---

[2] So significant to the Civil Rights Movement were Parks's actions of December 1, 1955, that even the actual bus on which Parks made her famous stand, Bus No. 2875, has been preserved as a museum exhibit at the Henry Ford Museum. *See* Rosa Parks Bus, THE HENRY FORD MUSEUM http://www.thehenryford.org/exhibits/rosaparks/faq.asp (last visited Dec. 22, 2015).

So it is not surprising that authors would write about Parks's story and artists would celebrate it with their works.  The commemoration and dissemination of Parks's journey continues to entrench and embolden our pursuit of justice.  And it is in the general public interest to relentlessly preserve, spotlight, and recount the story of Rosa Parks and the Civil Rights Movement—even when that interest allegedly conflicts with an individual right of publicity.

## I.

The Rosa and Raymond Parks Institute for Self Development (the "Institute") is a Michigan 501(c)(3) non-profit corporation[3] that owns the name and likeness of the late Rosa Parks[4] pursuant to a right-of-publicity assignment.  Target Corporation ("Target"), a national retail corporation headquartered in Minneapolis, Minnesota, operates more than 1,800 retail stores across the United States.

---

[3] A 501(c)(3) non-profit corporation refers to a corporation "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purpose, or to foster national or international amateur sports competition."  26 U.S.C. § 501(c)(3) (2014).

[4] Parks passed away in 2005.  Debbi Wilgoren & Theola S. Labbe, *An Overflowing Tribute to an Icon*, WASHINGTON POST, Nov. 1, 2005, at 1, http://www.washingtonpost.com/wp-dyn/content/article/2005/10/31/AR2005103100370.html.  Her public importance was as great then as at any prior time.  Parks's body lay in state in the Capitol Rotunda, and lines "snaked for blocks around the complex and across the Mall" for people to pay their final respects to Parks.  *Id.* at 2.  A public memorial service followed at the Metropolitan AME Church in Washington, D.C.  *Id.* Among others, the United States Secretaries of Defense, Homeland Security, and Labor, as well as the Senate Majority and Minority Leaders, attended.  *Id.*  President George W. Bush ordered flags at federal buildings to be flown at half-staff on the day of Parks's funeral.  *Id.* at 1.

Target offered seven books about Parks for retail: (1) *Rosa Parks: My Story*, by Rosa Parks and Jim Haskins[5]; (2) *Who Was Rosa Parks?*, by Yona Zeldis McDonough; (3) *Rosa Parks: Childhood of Famous Americans*, by Kathleen Kudlinski; (4) *Rosa Parks*, by Eloise Greenfield; (5) *A Picture Book of Rosa Parks*, by David A. Adler[6]; (6) *The Rebellious Life of Mrs. Rosa Parks*, by Jeanne Theoharis[7]; and (7) *The Story of Rosa Parks*, by Patricia A. Pingry.[8]  Target also sold the American television movie, *The Rosa Parks Story*,[9] and a collage-styled

---

[5] This book, obviously, was an autobiography.

[6] This book was a part of a series called "Picture Book Biographies." *See* http://www.amazon.com/Picture-Book-Parks-Biographies-Biography/dp/082341177X   (last visited Dec. 22, 2015).

[7] Melissa Harris-Perry, the host of MSNBC's *Melissa Harris-Perry*, said that this book "will undoubtedly be hailed as one of the most important scholarly contributions to civil rights history ever written. . . .  I can't wait to assign this book in every class I teach."  Review by Melissa Harris-Perry, http://www.amazon.com/Rebellious-Life-Mrs-Rosa-Parks/dp/0807033324 (last visited Dec. 22, 2015).  Henry Louis Gates Jr. agreed, "Theoharis brings all of her talents as a political scientist and historian of the civil rights movement to bear on this illuminating biography of the great Rosa Parks."  *Id.*

[8] *Who Was Rosa Parks?*, *Rosa Parks: Childhood of Famous Americans*, *Rosa Parks*, and *The Story of Rosa Parks* were all books directed towards sparking the interests of children, as the primary audience, in Parks's role in the modern Civil Rights Movement.  *See* http://www.amazon.com/Rosa-Parks-Yona-Zeldis-McDonough/dp/0448454424 (last visited Dec. 22, 2015); http://www.amazon.com/Rosa-Parks-Childhood-Famous-Americans/dp/0689839251 (last visited Dec. 22, 2015); http://www.amazon.com/Rosa-Parks-Trophy-Chapter-Book/dp/0064420256 (last visited Dec. 22, 2015); http://www.amazon.com/Story-Rosa-Parks-Patricia-Pingry/dp/0824966872 (last visited Dec. 22, 2015).

[9] Angela Bassett played the title role.  *See* http://www.imdb.com/title/tt0293562/ (last visited Dec. 22, 2015).  Dexter Scott King, the son of Dr. Martin Luther King, Jr., produced the film and played the role of his father.  *See id.*; *see also* http://kingencyclopedia.stanford.edu/encyclopedia/encyclopedia/enc_king_dexter_scott_1961/ (last visited Dec. 22, 2015).  Dexter King was named after the Dexter Avenue Baptist Church, the church where Dr. King held his first pastorate. http://kingencyclopedia.stanford.edu/encyclopedia/encyclopedia/enc_king_dexter_scott_1961/; http://www.dexterkingmemorial.org/about/ (last visited Dec. 22, 2015).  Dr. King was serving as

plaque that included, among other items, a picture of Parks, alongside Dr. Martin Luther King, Jr.[10]

The plaque was emblazoned with the title, "Civil Rights." Besides Parks's photograph and a statement of the years that she lived, the plaque included the word, "CHANGE," and it contained a photograph and diagram of the bus where Parks threw down the Civil Rights Movement gauntlet, as well as a picture of the Congressional Gold Medal that Parks was later awarded. Overlaid on the photograph of Parks and Dr. King was the statement, "People always say that I

---

the pastor of the Dexter Avenue Baptist Church when Parks refused to give up her seat on the bus. He was instrumental in the Montgomery Bus Boycott. http://www.thekingcenter.org/bus-boycott-sparks-movement (last visited Dec. 22, 2015).

[10] Below is a picture of the plaque in question:



During oral argument, counsel for the Institute asserted that Target also sold another Parks plaque. The only other plaque referred to in the record was sold under the same merchandise identification label, "Created Equal," but it did not depict Parks. Instead, it contained pictures of Dr. King and other images related to the Civil Rights Movement. The plaques were packaged and sold simultaneously.

didn't give up my seat because I was tired, but that isn't true.  I was not tired physically. . . [.] I was not old . . . [.]  I was forty two.  No, the only tired I was, was tired of giving in."

Stephanie Workman Marrott, the professional artist who designed the plaque, explained that she created it to "tell[] a story about civil rights in America . . . [to] describe important aspects of American history and convey a message about those events."  She added that her decision to "include[] the name and image of Rosa Parks, as well as an image of the Montgomery bus and the word 'CHANGE,' was in order to tell the story of Rosa Parks and the civil rights movement in a way that would convey an inspirational message about standing up for what you believe is right and what you believe in."

Six of the books, the movie, and the plaque became available for sale on Target's website or in some of its retail stores before November 2011.  In 2013, the Theoharis book was added to Target's online retail.  There is no evidence in the record that any of the products say "Target" on them or are otherwise identifiably affiliated with Target in any way other than that Target offered them for sale.

On November 6, 2013, the Institute filed the underlying complaint in the Middle District of Alabama.  Invoking diversity jurisdiction, the Institute alleged claims for unjust enrichment, right of publicity, and misappropriation under

Michigan common law for Target's sales of all items using the name and likeness of Rosa Parks.

Generally, the Institute complained that, by selling the products identified above, Target had unfairly and "without [the Institute's] prior knowledge, or consent, used [Parks's] name, likeness, and image to sell products and did promote and sell products using [Parks's] name, likeness, and image for [Target's] own commercial advantage."  After Target sought summary judgment, the district court dismissed the complaint, and this appeal followed.  We now affirm the district court's dismissal of the Institute's complaint.

## II.

The "starting point . . . in all cases in which subject-matter jurisdiction is premised on diversity of citizenship[] is *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)."  *Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1102-03 (5th Cir. Unit A June 1981).[11]  Because no federal common law exists, under *Erie*, a federal court sitting in diversity applies the substantive law of the state in which it sits except in cases governed by federal law or the United States Constitution.  *Id.* Here, Alabama's choice-of-law rules control and hold that the procedural law of the forum state is applied, while the law of the state in which the injury occurred

---

[11] The decisions of the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981, are binding as precedent in the Eleventh Circuit.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

governs the substantive rights of the case. *Fitts v. Minn. Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991). Accordingly, in this case we apply the procedural rules of Alabama and the substantive law of Michigan.[12]

In consulting Michigan's laws, we first consider rulings of Michigan's Supreme Court. *See Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1388 (5th Cir.), *cert. denied*, 449 U.S. 836 (1980). Where the highest court in the state has rendered no decisions on point, however, we must follow the opinions of Michigan's intermediate courts, unless we are "convinced that the highest court would decide otherwise." *Id.* (citing *Comm'r v. Bosch*, 387 U.S. 456, 465 (1967)).

In Michigan, the common-law right of privacy protects against four types of invasions of privacy:

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
2. Public disclosure of embarrassing private facts about the plaintiff.
3. Publicity which places the plaintiff in a false light in the public eye.
4. Appropriation for the defendant's advantage, of the plaintiff's name or likeness.

---

[12] It appears that Alabama's statute of limitations would preclude a claim based on all but one of the books at issue. Ala. Code § 6-2-38(l) (1975). Alabama typically considers statutes of limitations procedural, *Randolph v. Tenn. Valley Auth.*, 792 F. Supp. 1221, 1222 (N.D. Ala. 1992), and generally applies what is known as the single-publication rule to tort claims. *See Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 957 (Ala. 2013); *Cofer v. Ensor*, 473 So. 2d 984, 987 (Ala. 1985). Although Alabama courts have not yet addressed whether they would apply the single-publication rule to common-law right-of-publicity claims, we are inclined to believe that they would. *See, e.g.*, *Poff v. Hayes*, 763 So. 2d 234, 242 (Ala. 2000). But because Michigan's well-established qualified privilege for matters of public concern soundly resolves this case, we do not address this specific issue.

*Tobin v. Mich. Civ. Serv. Comm'n*, 331 N.W.2d 184, 189 (Mich. 1982) (quoting *Beaumont v. Brown*, 257 N.W.2d 522, 533 (Mich. 1977), *overruled on other grounds by Bradley v. Saranac Cmty. Sch. Bd. of Educ.*, 565 N.W.2d 285, 302 (Mich. 1997)).  The last category of invasion of privacy—misappropriation of a person's name or likeness—is commonly referred to as a violation of the "right of publicity."  *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 728-29 (E.D. Mich. 2000) (applying Michigan law), *aff'd*, 267 F.3d 457 (6th Cir. 2001).

Michigan's common-law right of publicity "is founded upon 'the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others.'"  *Battaglieri v. Mackinac Ctr. for Pub. Pol'y*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004) (quoting RESTATEMENT SECOND OF TORTS, § 652C cmt. a (1977)). This particular privacy right guards against the appropriation of "the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for the purpose of trade."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46 (1995).

Privacy rights, however, are not absolute.  *Earp v. City of Detroit*, 167 N.W.2d 841, 845 (Mich. Ct. App. 1969).  The Michigan Constitution guarantees that "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted

to restrain or abridge the liberty of speech or of the press." MICH. CONST. of 1963, art. I, § 5.[13] Premised on this state constitutional right, Michigan courts have long recognized that individual rights must yield to the qualified privilege to communicate on matters of public interest.[14] *Lawrence v. Fox*, 97 N.W.2d 719, 721 (Mich. 1959); *Dienes v. Associated Newspapers, Inc.*, 358 N.W.2d 562, 565 (Mich. Ct. App. 1984).

The "qualified privilege to report on matters in the public interest is deeply rooted in Michigan jurisprudence," *Rouch v. Enquirer & News of Battle Creek*, 398 N.W.2d 245, 253 (Mich. 1986), and, where the facts are undisputed, presents a question of law. *Tumbarella v. Kroger Co.*, 271 N.W.2d 284, 289 (Mich. Ct. App. 1978). The privilege attaches to matters of general public interest, *Peisner v. Detroit Free Press, Inc.*, 266 N.W.2d 693, 697 (Mich. Ct. App. 1978), and "extends to all communications made bona fide upon any subject-matter" where

---

[13] The protection derived from this provision of the Michigan Constitution provides the necessary shield for the works at issue and we need not address whether the First Amendment would also serve to protect the works. *See United States v. Charles*, 722 F.3d 1319, 1332-35 (11th Cir. 2013) (Marcus, J., specially concurring) (relying on the "long-standing prudential policy 'that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable") (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S. Ct. 152, 154 (1994)). We nonetheless recognize and appreciate the efforts of amici in briefing the First Amendment issues.

[14] In Michigan, matters concerning freedom of speech may be shielded by an absolute or a qualified privilege. *Raymond v. Croll*, 206 N.W. 556, 557-58 (Mich. 1925). The absolute privilege is a narrow exception not applicable in the instant case, covering matters such as judicial proceedings, *Sanders v. Leeson Air Conditioning Corp.*, 362 Mich. 692, 695, 108 N.W.2d 761, 762 (Mich. 1961), proceedings of legislative bodies, and communications by military and naval officers. *Froling v. Carpenter*, 203 Mich. App. 368, 371, 512 N.W.2d 6, 8 (Mich. Ct. App. 1993).

11

the party communicating has an interest or a duty to a person having a corresponding interest or duty. *Bacon v. Mich. Cent. R. Co.*, 33 N.W. 181, 183 (Mich. 1887). This defense also "embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation." *Id.*[15]

The privilege afforded is not a constant but varies with the situation and the importance of the social issues at stake. *Peisner*, 266 N.W.2d at 697. In cases concerning social issues, Michigan courts and courts applying Michigan law have found the qualified privilege to extend to issues concerning even general topics of public concern. *See, e.g.*, *Gaynes v. Allen*, 339 N.W.2d 678, 681 (Mich. Ct. App. 1983) (public interest in matters of healthcare); *Peisner*, 266 N.W.2d at 698 (public interest in the administration of justice); *Weeren v. Evening News Ass'n*, 138 N.W.2d 526, 527 (Mich. Ct. App. 1965) (public interest in the broadcast of an historical documentary), *rev'd on other grounds*, 152 N.W.2d 676 (Mich. 1967); *Bichler*, 745 F.2d at 1011 (public interest in the closing of the only dinner theater

---

[15] Although most often used as a shield to liability in defamation and libel cases, Michigan's absolute and qualified privileges have been applied to preclude liability for claims premised on other torts. *See, e.g.*, *Meyer v. Hubbell*, 324 N.W.2d 139, 144 (Mich. Ct. App. 1982) (applying absolute privilege to preclude claim of intentional infliction of emotional distress and tortious interference with economic relations); *Bichler v. Union Bank & Trust Co. of Grand Rapids*, 745 F.2d 1006, 1011 (6th Cir. 1984) (en banc) (applying Michigan law and the qualified privilege to preclude right-of-privacy claim). The Restatement of the Law also recognizes that the same qualified privilege applicable to defamation and libel claims would apply with equal force to invasion-of-privacy claims. RESTATEMENT (SECOND) OF TORTS § 652G cmt. a (1977). ("Under any circumstances that would give rise to a conditional privilege for the publication of defamation there is likewise a conditional privilege for the invasion of privacy."); *Beaumont v. Brown*, 336 N.W.2d 26, 27 (Mich. Ct. App. 1983) (citing RESTATEMENT (SECOND) OF TORTS § 652G).

in Western Michigan); *Schultz v. Newsweek, Inc.*, 481 F. Supp. 881, 884 (E.D. Mich. 1979) (public interest in liquor-license application as a matter of public function).

Of course, it is beyond dispute that Rosa Parks is a figure of great historical significance and the Civil Rights Movement a matter of legitimate and important public interest.  And it is uncontested that five of the six books, including an autobiographical book co-authored by Parks herself, and the movie are all *bona fide* works of non-fiction discussing Parks and her role in the Civil Rights Movement.  As for the sixth book, *Rosa Parks: Childhood of Famous Americans*, by Kathleen Kudlinski, it is a fictionalized biography meant to introduce children to the importance of Parks, so it, too, concerns a matter of public interest.

Similarly, the plaque depicts images and mentions dates and statements related to Parks and the Civil Rights Movement, in an effort to convey a message concerning Parks, her courage, and the results of her strength.  Indeed, all of the works in question "communicate[] information, express[] opinion[s], recite[] grievances, [and] protest[] claimed abuses, . . . on behalf of a movement whose existence and objectives" continue to be "of the highest public interest and

13

concern." *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S. Ct. 710, 718, 11 L. Ed. 2d 686 (1964) (discussing the Civil Rights Movement).[16]

Although the qualified privilege is not invincible, *Lins v. Evening News Ass'n*, 342 N.W.2d 573, 581 (Mich. Ct. App. 1983), the Institute has not articulated any argument as to why Michigan's qualified privilege for matters of public concern would not apply to these works, in light of the conspicuous historical importance of Rosa Parks. Nor can we conceive of any.

The use of Rosa Parks's name and likeness in the books, movie, and plaque are necessary to chronicling and discussing the history of the Civil Rights Movement—matters quintessentially embraced and protected by Michigan's qualified privilege. Indeed, it is difficult to conceive of a discussion of the Civil Rights Movement without reference to Parks and her role in it. And Michigan law does not make discussion of these topics of public concern contingent on paying a fee. As a result, all six books, the movie, and the plaque find protection in Michigan's qualified privilege protecting matters of public interest.[17]

---

[16] Michigan courts have been clear that "[t]he rights to free speech under the Michigan and federal constitutions are coterminous . . . [and t]hus, federal authority construing the First Amendment may be used in construing the Michigan Constitution's free speech guarantee." *Burns v. City of Detroit*, 660 N.W.2d 85, 93 (Mich. Ct. App. 2002).

[17] The district court held that the Institute's claims of misappropriation and unjust enrichment were derivative of its right-of-publicity claim. The Institute's misappropriation claim is the same as its claim based on the right of publicity and is thus duplicative. *See Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.3d 831, 834 (6th Cir. 1983) (applying Michigan state law) (stating that misappropriation of likeness "has become known as 'the right of publicity'"). Because we find that Target did not unlawfully use Parks's name and likeness, any acquired

## V.

In short, the district court did not err in dismissing the Institute's complaint.

The district court's order is **AFFIRMED**.

---

benefit would not have been unjust, so the Institute's common-law claim of unjust enrichment necessarily fails. *Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (2010).

15